UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
GAIA HOUSE MEZZ LLC,  :
 :
                     Plaintiff,  :  Case No.: 1:11-cv-03186-TPG
 :
             - against -  :  **ECF Case**
 :
STATE STREET BANK AND TRUST  :
COMPANY,  :  **DECLARATION OF**
 :  **GLAUCO LOLLI-GHETTI**
 :  **IN SUPPORT OF PLAINTIFF'S**
                  Defendant.  :  **MOTION FOR A PRELIMINARY**
---------------------------------------------------------X  **INJUNCTION**

        I, GLAUCO LOLLI GHETTI, declare the following to be true under penalties of perjury:

        1.       I am the founder and Principal of Urban Muse, a privately held, New York-based real estate development and investment company, and an indirect investor in Plaintiff Gaia House Mezz LLC ("Gaia"). I have personal knowledge of the facts set forth herein.

        2.       I submit this declaration in support of Gaia's motion for a preliminary injunction to maintain the status quo during the pendency of this suit by enjoining defendant State Street Bank and Trust Company ("State Street") from exercising remedies against Gaia on the basis of purported defaults of certain loan agreements (the "Motion").

        3.       Gaia's Motion seeks to maintain the status quo until the issues in this litigation can be determined, in particular a determination as to whether there has been a material default of the loan agreements and whether State Street is owed only the remaining

$4.1 million principal loan balance. State Street asserts that two past purported defaults entitle it to an additional $4.5 million in accrued interest.[1] A copy of the Complaint is attached hereto as Exhibit 1.

    4.  State Street's manufactured defaults prevent Gaia from being able to close a refinancing that would permit it to exercise its rights to obtain certain real estate and repay the remaining loan balance by July 15, 2011.

    5.  Recognizing Gaia's precarious situation and need for outside financing, State Street is refusing the release its lien on the real estate at issue unless it is paid the *additional* $4.5 million in accrued interest beyond the $4.1 million loan balance by July 15, 2011.

**General Background**

    6.  Gaia is the sole member and one hundred percent owner of Gaia House LLC ("Gaia House LLC"), a New York limited liability company.

    7.  In or about 2006, Gaia House purchased land near the Chelsea Piers complex in New York City with the intent to construct a luxury condominium building Gaia House which is a one-of-a kind 19-story, 62,000 square foot ground up residential condominium. The plan for Gaia House included sixteen residential units, constructed with unique architecture, materials, and design concepts.

---

[1] Defendant asserts that it is owed an additional $4.3 million in accrued interest plus $202,190.54 in default interest (for the purposes of this Motion, the accrued interest and default interest are simply referred to as "Accrued Interest").

8.      For example, each residential unit offers an En-Suite Sky Garage, an innovative and unique concept that provides each unit with a 300 square foot space accessed by key-lock elevator and engineered for use as a car garage adjacent to the unit.

9.      Moreover, Gaia House offers irreplaceable and magnificent views of the Hudson River, Chelsea Cove, and the Hudson River Park, a nine-acre park of open space, gardens, tree groves, and biking and running paths.  Just as important, Gaia House is located in a vibrant area undergoing tremendous cultural evolution and a hub for New York's art galleries.  Helping to drive the neighborhood's artistic growth and livability is the nearby New York High Line, an elevated park that provides an additional 1.5 miles of open space.

**Gaia Secures A Loan From Lehman Brothers To Finance Construction Of The Luxury Condominium**

10.     Gaia has invested over $14 million of its own money in Gaia House.[2]

11.     In addition, to finance construction of Gaia House, Gaia entered into a loan agreement in December 2006 with Lehman Brothers Holdings, Inc. ("Lehman").  A copy of the Mezzanine Construction Loan Agreement is attached hereto as Exhibit 2.

---

[2] Gaia initially invested in Gaia House with the expectation of recouping their investment from unit closing proceeds.  Because of Gaia House's delays, however, rather than recouping those proceeds, Gaia has put their portion of those proceeds back in Gaia House and injected *additional* equity into Gaia House.  In other words, while Gaia House's lenders have been continually repaid from the unit closing proceeds, Gaia has injected more and more equity into Gaia House without recouping anything.

12. Pursuant to the loan agreement, Lehman agreed to make a mezzanine loan to Gaia in the principal amount of $11,800,000 (the "Loan").

13. On November 21, 2007, the terms of the Loan were amended to increase the maximum principal amount to $20,734,386 (the "First Modification").

**State Street Acquires The Loan From Lehman Brothers And State Street And Gaia Agree To Modify The Loan Agreement**

14. In or about the summer of 2008, the United States economy and the real estate market collapsed. In September 2008, Lehman filed for bankruptcy.

15. Following Lehman's bankruptcy, State Street acquired a large portfolio of collateral from Lehman, including the Loan, at a substantial discount.

16. In fact, because of the problems with the economy, many of the contractors working on Gaia House went out of business and had to be replaced, which delayed the progress of construction at Gaia House.

17. On or about September 23, 2009, Gaia and State Street modified the terms of the Loan (the "Second Modification"). A copy of the Second Modification is attached hereto as Exhibit 3.

18. In particular, among other things, Section 1.2(b) of the Loan Agreement was amended to provide Gaia with the option to extend the maturity date of the Loan for four successive terms. The first extension option was from July 2, 2009 to January 15, 2010; the second extension option was from January 16, 2010 to July 15, 2010; the third extension option was from July 16, 2010 to January 15, 2011; and the fourth extension

option was from January 16, 2011 to July 15, 2011.  Gaia has exercised this option for each of the four terms and the current scheduled maturity date of the Loan is July 15, 2011.

   19.  On or about May 19, 2010, Gaia and State Street modified the terms of the Loan (the "Third Modification").  A copy of the Third Modification is attached hereto as Exhibit 4.

   20.  Among other things, the Third Modification amended the loan agreement in three ways:

    (a)  The principal amount of the Loan was amended to include interest accrued prior to June 2010.  After the Third Modification, the total principal amount of the Loan was $30,811,707.

    (b)  State Street agreed to waive its right to be paid interest accruing after the date of the Third Modification ("Accrued Interest").

    (c)  Section 7.34 of the Loan Agreement was amended to provide Gaia the right to purchase up to five residential units in Gaia House (Residential Units 5S, 8N, 11S, PH1, and PH2) at a minimum set price (the "Affiliate Buyout Provision").

   21.  Generally, the loan modifications were designed to maximize the potential that Gaia House would be successfully completed and iStar (the Project's senior lender), State Street, and, lastly, Gaia, would all be repaid their loans and equity, respectively.  Indeed, the purpose and intent of the Third Modification was to give Gaia a chance to recoup some or all of the more than $14 million it invested in Gaia House.

22. In conjunction with the Loan and each subsequent modification, Gaia and State Street executed an agreement, integrated with the other loan agreements, known as a lockbox agreement, that governs the order in which the proceeds from the sale of residential units in Gaia House are to be distributed to Gaia House's lenders and owners (the "Waterfall").

23. The most recent iteration of the lockbox agreement, the Second Amended and Restated Security Agreement and Lockbox Agreement, dated May 19, 2010 (the "Lockbox Agreement"), was executed the same day as the Third Modification and sets forth the Waterfall in effect.  A copy of the Lockbox Agreement is attached hereto as Exhibit 5.

24. The Lockbox Agreement provides that so long as no default is continuing, the proceeds of the sales at Gaia House are to be paid according to the Waterfall as follows:  (i) the Loan, *other than Accrued Interest and Additional Interest*, shall be repaid; (ii) Gaia shall be repaid its equity balance at the maturity date; and (iii) the borrower and lender shall split evenly any balance thereafter.

25. Thus, the Lockbox Agreement is clear that so long as no default was continuing, no Accrued Interest was owed.

**Gaia Makes Tremendous Progress Since The Third Modification**

26. Since the Third Modification, Gaia has invested significant time, effort, and money into Gaia House and made tremendous progress toward making Gaia House a success.

27. On or about July 15, 2010, Gaia obtained temporary certificates of occupancy ("TCOs"), a document issued by a local government agency after an inspection that certifies a building's compliance with applicable building codes and suitability for occupancy, for every residential unit in the Project except one (unit PH2). The TCO for PH2 was obtained on November 22, 2010 and provided to State Street on December 1, 2010. Less than a month later (December 23, 2010), Gaia closed the sale of PH2. A copy of the TCO obtained on November 22, 2010 is attached hereto as Exhibit 6.

28. Since the Third Modification, Gaia has closed $38.9 million in unit sales (units 2N, 4N-S, 5S, 6N, and PH2), the proceeds of which were used to repay Gaia House's lenders:

    (a) In August 2010, Gaia House's senior lender, iStar, was fully repaid with the proceeds from the sale of unit 4N-S;

    (b) In August 2010, State Street was paid more than $3.8 million with the proceeds from the sale of unit 2N;

    (c) In October 2010, State Street was paid more than $5 million with the proceeds from the sale of unit 6N;

    (d) In December 2010, State Street was paid almost $13 million with the proceeds from the sale of unit PH 2; and

    (e) In January 2010, State Street was paid almost $5 million with the proceeds from the sale of unit 5S.

29. Except for the three units that Gaia has a right to purchase (units 8N, 11S, and PH1), all the units in Gaia House are sold or under contract.

30. Gaia House has been transitioned to a property management team, several units are now occupied, and a board of managers has been elected for the building.

31. Gaia has satisfied each and every periodic loan paydown covenant established by the loan agreement and documents. The remaining loan balance is $4,197,203.

**State Street Manufactures Non-Material Defaults**

32. Despite Gaia's successes since the Third Modification, on December 2, 2010, State Street blind-sided Gaia with a letter alleging several immaterial defaults which had been cured prior to the date State Street gave notice of default, by a period of approximately six months. (the "Notice of Default"). Between the Third Modification and the Notice of Default, State Street did not raise issues with Gaia's work to complete Gaia House or repayment of the Loan and certainly did not raise the existence of any defaults, despite frequent and recurring interactions, including weekly phone calls and meetings. A copy of the Notice of Default is attached hereto as Exhibit 7.

33. Notwithstanding the fact that State Street has been paid every dollar that it was due, on December 2, 2010, State Street sent the Notice of Default asserting that Gaia defaulted under the Loan Agreement because it (*i*) ) failed to obtain a TCO for one unit (PH2) by the then-scheduled loan maturity date July 15, 2010 and (ii) failed to achieve "Substantial Completion" of Gaia House by the then-scheduled loan maturity date of July 15, 2010. Additionally, State Street's Notice of Default letter stated that if Gaia failed to cure the defaults, Gaia would have no right to exercise the fourth extension.

34. Neither of the alleged defaults existed at the time the Notice of Default was issued. As described above, Gaia House is substantially completed and the TCO for PH 2 was obtained in November 2010, both before the Notice of Default was sent.

35.	Gaia is not currently in default of the loan agreement and was not in default of the loan agreement when Defendant noticed the defaults on December 2, 2010, nearly six months after the defaults allegedly came into existence and, even more incredibly, after the defaults had been cured.  The alleged defaults are non-monetary defaults; that is, State Street has been paid every dollar it has been owed to this point; State Street has been paid nearly $27 million of the $30.8 million principal loan balance.  The remaining balance of $4.1 million is due on July 15, 2011, and, if State Street ceases interfering with Gaia's ability to obtain its "take out" financing and purchase the real estate at issue, the $4.1 million will be timely paid.

36.	In fact, Gaia House was substantially complete much earlier.  Gaia received a Certificate of Substantial Completion by an architect stating that by May 2010 the Project satisfied industry-wide substantial completion standards, including: (i) a lender funded requisition confirming 97% completion; (ii) functional and operational building systems; (iii) closings for a substantial number of units, with purchasers occupying such units; and (iv) contractors starting work following the issuance of punch list items.  A copy of the Certification of Substantial Completion is attached hereto as Exhibit 8.

37.	Moreover, at the time the Notice of Default was issued, the scheduled loan maturity date was no longer July 15, 2010.  Rather, as described above, the scheduled loan maturity date was extended, pursuant to the Second Modification, to January 15, 2011, making alleged defaults that State Street said existed as of July 2010, even more strained.

38.     More importantly, the alleged defaults never had any economic impact on State Street or Gaia House's completion by the scheduled maturity date. As described above, Gaia has not missed any payment covenants, State Street has been paid almost $27 million dollars of the $30.8 million loan balance, and Gaia has lined up "takeout" financing that will enable the final $4.1 million owed to State Street to be paid. The fact that State Street will be fully repaid prior to the completion of any alleged remaining minor, technical parts of Gaia House further undermines any claim that a continuing default exists. Indeed, Gaia communicated its belief that they were not in default of the loan agreement by letter dated December 7, 2010, and advised State Street that Gaia was therefore exercising its fourth extension option to extend the scheduled maturity date to July 15, 2011. A copy of the December 7, 2010 letter is attached hereto as Exhibit 9.

39.     By letter dated January 7, 2011, State Street permitted Gaia's fourth extension option, impliedly conceding that no default had occurred or was continuing. Nevertheless, in the same letter, State Street asserted for the first time that State Street was reneging on the waiver of Accrued Interest set forth in the Third Modification based on the alleged "defaults" and therefore demanded that Gaia pay on additional $4.5 million in Accrued Interest to State Street. A copy of the January 7, 2011 letter is attached hereto as Exhibit 10.

40.     However, by letters dated January 21, 2011 and February 22, 2011, State Street approved two draw requests by Gaia (draw request #38 for $399,088.96 and draw request #39 for $171,447.91), again impliedly conceding that no default had occurred or was occurring. The January 21, 2011 letter is attached hereto as Exhibit 11 and the February 22, 2011 letter is attached hereto as Exhibit 12.

41.     Thus, even if immaterial already cured non-monetary which had no effect on the repayment of the loan could somehow entitle State Street to renege on waiving the Accrued Interest, State encouraged Gaia to complete Gaia House while holding the alleged defaults in its back pocket and, even after providing the Notice of Default, acted as if the defaults did not exist and were not material.

**Gaia Obtains Financing To Pay Off The Remaining Loan Balance And Exercise Its Affiliate Buyout Provision**

42.     On March 15, 2011, Gaia's affiliate advised State Street that it intended to exercise the Affiliate Buyout Provision.  A copy of the March 15, 2011 letter is attached hereto Exhibit 13.

43.     Because Gaia has invested almost all of its funds in Gaia House and has not recouped any of its equity, outside "take out" financing is the only route for Gaia to exercise its Affiliate Buyout Provision to acquire the remaining units (PH1, 11S, and 8N), unique and valuable real estate assets, and thereby pay the $4.1 million remaining on the State Street Loan.

44.     In May 2011, Gaia obtained a commitment from Doral Bank ("Doral") for financing sufficient to pay off the remaining Loan balance of $4.1 million and exercise its Affiliate Buyout Right for the three remaining units (PH1, 11S, and 8N), but, as is customary, Doral's loans will be secured by a lien on those units.

45.     In fact, in order to provide an interim solution while this litigation continues, Doral has agreed to limit its lien to two of the units, leaving PH1 free for State Street to place a lien for the $4.5 million in Accrued Interest at issue in this litigation.

46. The proceeds from the Affiliate Buyout Provision should be distributed pursuant to the Waterfall because there is no continuing default. Thus, State Street should be paid the remaining principal loan balance of $4.1 million, not $8.6 million..

**State Street's Actions Are Prompted By Bad Faith And Cause Irreparable Harm To Gaia**

47. Gaia made State Street aware that Gaia has obtained financing to exercise its Affiliate Buyout Provision, and that, pursuant to the Waterfall, State Street would be paid the remaining principal loan balance of $4.1 million.

48. State Street, however, is refusing to release its lien on the units unless it is paid an *additional* $4.5 million in Accrued Interest and other charges beyond the $4.1 million loan balance.

49. By letter dated March 24, 2011, State Street insisted that it has sole discretion to distribute the proceeds from the Affiliate Buyout Provision. State Street contends that the Waterfall does not apply because of the alleged defaults. State Street argues that it should be first distributed at least $8.6 million (the remaining principal balance plus $4.5 million in claimed Accrued Interest) and the remaining proceeds can be distributed to Gaia in partial payment of its equity balance. A copy of the March 24, 2011 letter is attached hereto as Exhibit 14. The Doral loan does not provide enough financing to pay more than the $4.1 million remaining balance.

50. According to the plain terms of the Waterfall, it applies unless there is a continuing default. There is no continuing default. As a result, no Accrued Interest is owed.

51. More importantly, State Street's claimed defaults and Accrued Interest are calculated tactic to derail Gaia from obtaining financing to exercise the Affiliate Buyout Provision and thereby obtain the valuable real estate interests at stake here.  As State Street is aware, if Gaia is unable to obtain the Doral loan and pay of the remaining Loan balance, State Street can foreclose on Gaia House through a quick UCC foreclosure and then transfer the real estate away beyond Gaia's reach.

52. Thus, if State Street is permitted to exercise remedies arising from their non-existent defaults, Gaia will be irreparably injured because it will not be able to obtain the unique real estate at issue.  Without an injunction to maintain the status quo, the relief sought in the complaint will be rendered moot because Gaia will be deprived of its ability to close on the real estate at issue and State Street will obtain the real estate through foreclose.

53. The effect on Gaia from being denied its right to purchase the unique three remaining units would be profound.  State Street's improper attempts to claim an unwarranted default will have irreparable repercussions beyond just Gaia House and the real estate at issue.  Gaia's and its affiliates' business reputations and ability to obtain financing for future business ventures will be destroyed, effectively crippling their business.

54. Gaia and its affiliates have never been declared in default by a lender and enjoy an impeccable reputation in the commercial real estate and development community.  Indeed, State Street presumably agreed to two loan modifications because of Gaia's stellar reputation and business record, and, in fact, Gaia was able to rescue the Gaia

House during the economic collapse that began in 2008 which particularly affected the real estate markets in New York.

56. Gaia and its affiliates rely on their unblemished reputation, goodwill, and credit worthiness, as well as its past business record, to function as a developer in the competitive market for large-scale real estate development projects. If left unrestrained, State Street's actions will not only deprive Gaia of the real estate at issue, but will prevent financing from all other sources, decimating any hope Gaia and its affiliates would have of continuing in business.

**Injunctive Relief Will Cause No Harm To State Street**

56. Injunctive relief will cause no harm to State Street whatsoever because Gaia will pay off the agreed $4.1 million remaining loan balance and has agreed to provide security to State Street to collect the $4.5 million in Accrued Interest should State Street be successful in this litigation.

57. Indeed, Gaia has attempted to negotiate a reasonable solution with State Street on numerous occasions to avoid the need to seek injunctive relief, including as recently as Monday offering a senior lien on the PH1 unit, which is worth approximately $10 million dollars, to secure State Street's claim for $4.5 million. State Street has rejected these offers.

58. To secure State Street's claim, Gaia will agree that State Street can place a senior lien on PH1 pending the resolution of the litigation.

59. If PH1 is sold during pendency of litigation, Gaia will place the proceeds from the sale into an escrow account until the litigation is resolved.

60. No prior request for the relief herein sought has been made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22 day of June 2011
~~New York, New York~~
Saint Andrews, Scotland

Glauco Lolli-Ghetti
GAIA HOUSE
VICE PRESIDENT

15