UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
GAIA HOUSE MEZZ LLC,                                  :
                                                      :
                           Plaintiff,                 :        11 CV 3186 (TPG)
                                                      :
                       - against -                    :
                                                      :        **AMENDED COMPLAINT**
STATE STREET BANK AND TRUST                           :
COMPANY,                                              :
                                                      :
                           Defendants.                :
------------------------------------------------------X

Plaintiff Gaia House Mezz LLC ("Gaia" or "Borrower"), by its attorneys Davidoff

Malito & Hutcher LLP, as and for its Amended Complaint against Defendant State Street Bank

and Trust Company ("State Street" or "Lender"), alleges as follows on personal knowledge as to

itself and upon information and belief as to all other allegations:

### NATURE OF THE ACTION

     1.    This dispute between Gaia, as Borrower, and State Street, as Lender, arises

out of the Mezzanine Construction Loan Agreement, dated December 8, 2006 (the "Original

Loan Agreement"), and its subsequent modifications (collectively with the Original Loan

Agreement, the "Loan Agreement") that provided the construction financing for a luxury

condominium project near Chelsea Piers in New York City ("Gaia House" or the "project").

     2.    The downturn in the economy profoundly affected the real estate markets in

New York, and the resulting negative impacts on contractors working on Gaia House

substantially delayed progress on the project.  In the Spring of 2010, because its loans on the

project were non-recourse loans and because the Original Loan Agreement provided for a very

high rate of interest that compounded over time, it made no sense for Gaia to continue to work

on the project and spend another year finishing a project for which it would not see any return of its equity and which was then far from completion.

3.     State Street had not been paid any of its debt to that point, and without Gaia finishing Gaia House, it was unlikely State Street would have its debt paid.

4.     As a result, State Street, in order to induce Gaia to stay on and finish Gaia House, agreed to waive interest accruing after May 2010 ("Accrued Interest). This was important because with the waiver of the Accrued Interest, Gaia would see some return of its equity.

5.     Thus, on May 19, 2010, State Street and Gaia entered into the Third Modification to the Loan Agreement ("Third Modification"), which included the waiver of the Accrued Interest, and Gaia agreed to move ahead with Gaia House.

6.     In reliance on the Third Modification waiving the Accrued Interest, Gaia continued to work intensely on Gaia House, successfully marketed and sold the non-sponsor units, and finished the project. In the six months following the Third Modification, Gaia was able to pay off iStar (its senior lender) and pay down $27 million of the $30 million it owed to State Street under the loan. State Street has now been paid everything it was owed and in fact forced Gaia to pay it more than it was owed as set forth below. Gaia's efforts made it possible for State Street to be paid in full, an achievement that few borrowers can cite to these days and a result few lenders have reason to expect.

7.     Yet  instead of simply accepting payment of the amounts it was owed, on December 2, 2010, State Street blind-sided Gaia by alleging for the first time that several immaterial defaults had occurred six months before.

8.     These alleged defaults were immaterial, non-monetary defaults of the most technical nature. In any case, instead of putting Gaia on notice of these alleged defaults, and the

fact that State Street was reneging on its waiver of the Accrued Interest, State Street intentionally and purposefully did not mention these alleged defaults for nearly six months, not only concealing its intention to call these alleged defaults but its intention to renege on its agreement to waive the Accrued Interest.  Clearly State Street reasoned that if it noticed Gaia with these defaults and the fact that State Street was reneging on its waiver of the Accrued Interest, this would have caused Gaia to stop working on the project and State Street would not have been paid.  Because State Street had not been repaid any of its debt, it kept these defaults in its back pocket for six months, to spring on Gaia after the work was done.

9.     Even more egregious is the fact that Gaia was in constant contact with State Street and a collection of third-party consultants and advisors imposed on Gaia by State Street (at Gaia's cost) during that time and at no time did State Street or its consultants mention the alleged defaults or that Accrued Interest was due.

10.     State Street intended and expected Gaia to rely upon State Street's agreement to waive the Accrued Interest and its failure to call any defaults and Gaia did so rely in completing the work.  State Street knew it had no intention of abiding by its agreement to waive the Accrued Interest and that it was holding these alleged defaults in its back pocket intending to call them as soon as Gaia had done the work necessary to get State Street paid.

11.     Even though State Street induced Gaia to work very hard for State Street's purposes with the promise of waived Accrued Interest, State Street never had any intention of living up to its end of the agreement and waiving the Accrued Interest.  Rather, instead of acting on the defaults that State Street now says existed as of July 15, 2011, State Street duplicitously kept hidden its position that there had been some hyper-technical defaults that had no effect on

their being repaid, all the time inducing Gaia to finish Gaia House, in order to renege on its waiver of the Accrued Interest.

12.    Had Gaia known of State Street's intention it would have arranged other financing to take out State Street and not have been forced to incur or pay the Accrued Interest, or would not have expended the time, effort and money which resulted in State Street being repaid while it reneged on its agreement to waive the Accrued Interest.

## PARTIES

13.    Plaintiff Gaia is a Delaware limited liability company with its principal place of business at 435 Hudson Street, 4th Floor, New York, New York 10014.

14.    Upon information and belief, Defendant State Street is a Massachusetts corporation with its principal place of business at 1 Lincoln Street, Boston, Massachusetts 02111.

## JURISDICTION AND VENUE

15.    Defendant State Street removed the prior related action between the parties from New York Supreme Court to Federal Court upon its assertion that there is complete diversity in that case; however, upon information and belief, there are indications that there were other individuals or entities who purchased interests in or invested in the underlying loans on the lender side, the existence of which could result in a lack of complete diversity. Based upon Defendant's assertion of complete diversity, this Court would have jurisdiction over this action pursuant to 28 U.S.C. §1332 because, upon information and belief, the citizenship of the parties would be diverse and the amount in controversy exceeds $75,000. However, in order to pursue the necessary inquiry as to whether this Court has subject matter jurisdiction over this matter, in the face of the indications that there are other investors relevant to his action, Plaintiff will pursue the existence of such other possible investors. Venue is proper in New York County pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to

the claim occurred in New York County, and the property that is the subject of the action is located in New York County.

16.    Gaia and State Street expressly agreed that any disputes would be adjudicated in this Court or in Supreme Court, New York County.  The Loan Agreement provides at Section 12.33 that any action or proceeding brought by the Borrower against the Lender shall only be instituted in "the Borough of Manhattan in New York, New York."

17.    The Loan Agreement provides at Section 12.32 that the loan is governed by and is construed in accordance with the laws of the State of New York pursuant to §5-1401 of the New York General Obligations Law.   Section 12.32 also states the following:

> This loan agreement was negotiated in part in the State of New York, and the Loan was made by Lender in the State of New York, and the proceeds of the Loan delivered pursuant were disbursed from the state of New York, which State the Lender, Borrower and each Joinder Party agree has a substantial relationship to the parties and to the underlying transaction embodied hereby . . . .

## FACTS

### Gaia Secures A Loan From Lehman Brothers to Finance Construction of A Luxury Condominium

18.    In 2006, Gaia House, LLC, a New York limited liability company (the "Project Owner"), purchased land near the Chelsea Piers complex with the intent of constructing a luxury condominium building.  The plans for the Project included 16 residential units with a net saleable area of approximately 50,000 square feet of residential space.  Plaintiff Gaia is the owner of a one hundred percent (100%) interest in the Project Owner as the sole member thereof.  Gaia has invested over $14 million of its own money into Gaia House.

19.    To finance construction of Gaia House, Gaia entered into the Loan Agreement in December 2006 with Lehman Brothers Holdings, Inc. ("Lehman"), pursuant to which Lehman agreed to make a mezzanine loan to Gaia in the principal amount of $11,800,000

to be applied (i) to the cost of refinancing existing indebtedness of Project Owner and (ii) certain costs related to the demolition of the existing improvements located on the Land and the construction of all improvements, as set forth in the budget.

20.   On November 21, 2007, the Loan Agreement was amended to increase the maximum principal amount to $20,734,386 (the "First Modification").

## State Street's Acquires The Loan From Lehman Brothers

21.   As widely reported by the press, the credit and real estate markets collapsed in or around September 2008, as a result of which Lehman and its affiliates filed for bankruptcy on September 15, 2008.

22.   Following Lehman's bankruptcy, State Street acquired a large portfolio of collateral from Lehman, including the loan, at a substantial discount.  Due to the nature of the financing arrangement between State Street and Lehman, State Street was able to acquire the loan for far less than 100 cents on the dollar.

23.   Because of the dire and unprecedented economic and construction industry conditions beyond Gaia's control, including that many of the contractors working on Gaia House went out of business as a result of the Great Recession and had to be replaced, Gaia House fell behind schedule.

24.   On or about September 23, 2009, Gaia and State Street modified the terms of the loan (the "Second Modification").  A copy of the Second Modification is attached hereto as Exhibit A.

25.   In particular, among other things, Section 1.2(b) of the Loan Agreement was amended to provide Gaia with the option to extend the maturity date of the loan for four successive terms.  The first extension option was from July 2, 2009 to January 15, 2010; the second extension option was from January 16, 2010 to July 15, 2010; the third extension option

was from July 16, 2010 to January 15, 2011; and the fourth extension option was from January

16, 2011 to July 15, 2011.  Gaia has exercised this option for each of the four terms and the

scheduled maturity date of the loan was July 15, 2011.

### State Street Induces Gaia to Finish The Project By Agreeing To The Third Loan Modification Waiving Accrued Interest

26.    In May 2010, because of the downturn in the economy that profoundly

affected the construction industry and real estate markets in New York and because many of the

contractors working on Gaia House went out of business, thereby delaying progress on Gaia

House, it made no sense for Gaia to continue to work on Gaia House and spend another year on

the project for which it would not see any return of its equity, where the Loan was non-recourse

debt and where the Loan carried a very high rate of interest that compounded over time.

27.    As a result, on or about May 19, 2010, State Street induced Gaia to work to

finish the project by agreeing to modify the terms of the loan and executing the Third

Modification.  A copy of the Third Modification is attached hereto as Exhibit B.

28.    The Third Modification amended the loan agreement in three significant

ways:

> *First*, the principal amount of the Loan was amended to include prior accrued interest (making the total Loan amount due $30,811,707).
>
> *Second*, **State Street agreed to waive its right to Accrued Interest assuming certain conditions**.  (Section 1.2 of the Third Modification)
>
> *Third*, Section 7.34 of the loan agreement was amended to provide Gaia the right to purchase up to five residential units in Gaia House (Residential Units 5S, 8N, 11S, PH1, and PH2) at a fixed price (the "Affiliate Buyout Provision").

29.    The goal of the Third Modification was to maximize the potential that Gaia

House would be successfully completed and that iStar, State Street, and, lastly, Gaia would all be

repaid their loans (as modified) and equity, respectively. Indeed, the purpose and intent of the

Third Modification was to improve the likelihood State Street would have its debt repaid and give Gaia a chance to recoup some or all of the more than $14 million it invested in Gaia House.

30.    Importantly, in entering into the Third Modification, State Street agreed to waive the Accrued Interest because it had not been paid any of its debt to that point and, without Gaia finishing the project, was unlikely to have its debt repaid.  The waiver of the Accrued Interest provided Gaia with incentive to complete Gaia House, as it would then hope to see some return of its equity.

**Gaia Makes Tremendous Progress After The Third Modification**

31.    In reliance on the Third Modification, Gaia devoted significant time, effort, and money on Gaia House to make Gaia House a success.

32.    On or about July 15, 2010, Gaia obtained temporary certificates of occupancy ("TCOs"), a document issued by a local government agency after an inspection that certifies a building's or an individual unit's compliance with applicable building codes and suitability for occupancy, for every residential unit in the Project except one (unit PH2).  The TCO for PH2 was obtained on November 22, 2010 and provided to State Street on December 1, 2010.  Less than a month later (December 23, 2010), Gaia closed the sale of PH2.  A copy of the TCO obtained on November 22, 2010 is attached hereto as Exhibit C.  Gaia focused its efforts on each unit's TCO based on the unit's sales status (i.e., whether the unit was under contract of sale or not) and if under contract, the timing of its scheduled closing.  State Street and its consultants were fully aware of this strategy and approved such priorities.

33.    After the Third Modification, Gaia closed $38.9 million in unit sales (units 2N, 4N-S, 5S, 6N, and PH2), the proceeds of which were used to repay Gaia House's lenders:

   a.  In August 2010, Gaia House's senior lender, iStar, was fully repaid with the proceeds from the sale of unit 4N-S;

00431635                                      8

b. In August 2010, State Street was paid more than $3.8 million with the proceeds from the sale of unit 2N;

c. In October 2010, State Street was paid more than $5 million with the proceeds from the sale of unit 6N;

d. In December 2010, State Street was paid almost $13 million with the proceeds from the sale of unit PH 2; and

e. In January 2010, State Street was paid almost $5 million with the proceeds from the sale of unit 5S.

34. Gaia House has been transitioned to a property management team, several units are now occupied, and a board of managers has been elected for the building.

35. Gaia has satisfied each and every periodic loan paydown covenant established by the loan agreement and documents. By January 2010, the remaining loan balance to State Street was $4,197,203.

**State Street Duplicitously Kept the Non-Monetary Defaults In Their Back Pocket And Waited For Gaia to Complete The Project and Meet All of Gaia's Monetary Obligations to State Street**

36. Waiting until Gaia's successes after the Third Modification, which allowed State Street to be repaid, State Street, on December 2, 2010, blind-sided Gaia with a letter alleging several immaterial defaults which were approximately six months old and had already been cured prior to the date State Street gave the notice of default. (the "Notice of Default"). Between the Third Modification and the Notice of Default, State Street did not raise issues with Gaia's work to complete Gaia House or repayment of the loan and certainly did not raise the existence of any defaults, despite frequent and recurring interactions, including weekly meetings and bi-weekly phone calls and emails. A copy of the Notice of Default is attached hereto as Exhibit D.

37. Notwithstanding the fact that Gaia met every paydown covenant owed to State Street, on December 2, 2010, State Street sent the Notice of Default asserting that Gaia

defaulted under the Loan Agreement because it (*i*) failed to obtain a TCO for one unit (PH2) by July 15, 2010 and (ii) failed to achieve "Substantial Completion" of Gaia House by July 15, 2010.

38.    Moreover, at the time the Notice of Default was issued, the scheduled loan maturity date was no longer July 15, 2010. Rather, as described above, the scheduled loan maturity date was extended, pursuant to the Second Modification, to January 15, 2011, making alleged defaults that State Street said existed as of July 2010 even more strained and artificially manufactured.

39.    At no time during this nearly six month period from July 15, when the defaults allegedly took place, to the Notice of Default, did State Street claim, or even mention, that Gaia was, or even could be, in default. Further, State Street never told Gaia that it was reserving its "right" to declare Gaia in default in the future; only after State Street gave notice of the defaults in December, did State Street begin to formulaically include language expressly reserving their rights in connection with these alleged defaults. Indeed, only after six months of continuous work by Gaia on Gaia House (work State Street could not have accomplished on its own had they raised the defaults) which resulted in State Street's loan being paid off, did State Street then raise the defaults and include this formulaic language.

40.    Rather than indicating the existence of any event of default, State Street spent a significant amount of time encouraging Gaia to continue working on the project, with bi-weekly phone calls and weekly meetings and frequent emails and providing either explicit approvals of Gaia's actions and decisions or tacit consent to Gaia as to those actions through State Street's (and its consultants') approval process and failure to object. The lines of

communication were open and the message was always clear: continue to work hard and there would be no Accrued Interest due.

41.    For example, Gaia had weekly construction meetings every Tuesday with State Street's agent, Jones Lang LaSalle, during which the parties discussed, among other things, meeting minutes from the previous week, the construction schedule, the anticipated cost report and requisitions or invoicing showing the percent of substantial completion. Jones Lang LaSalle representatives who attended the meetings included Joshua Gleiber, Mike Huth, Greg Rutherford and Jennifer Morris. Construction meetings took place on at least the following dates between July 15, 2010 and December 2, 2010: July 20 and 27; August 3, 10, 17, 24 and 31; September 7, 14, 21, and 28; October 5, 19, and 26; November 2, 9, 16, 23, and 20. Not once during these weekly meetings did anyone mention that Gaia was in default. Rather, Jones Lang LaSalle, State Street's agent, praised Gaia for its tremendous hard work and accomplishments.

42.    In fact, during November 2010 and prior to State Street giving any indication of any default, Jones Lang LaSalle recommended that Gaia find a lender to pay off State Street early and State Street agreed to forgo a 50%/50% split to which it would otherwise be entitled under the relevant waterfall provisions after the repayment of debt and equity. There was no mention of Accrued Interest being due to State Street or the existence of any condition which could or would give rise to an event of default.

43.    Moreover, in addition to the weekly construction meetings, State Street and Gaia held bi-weekly calls. State Street representative, Robert Emslie, participated in those calls. The purpose of the calls was to review the following items: TCO updates with a spreadsheet showing units with and without TCO's; sales updates or closing projections; construction milestone updates; and any other issues or concerns with the project. These calls took place at

least on the following dates during the period from July 15, 2010 and December 2, 2010: July 21 and 28; August 11; September 8, and 22; October 6; November 3, and 17.  Never once during these calls did Mr. Emslie or Ms. Yang or anybody from State Street raise any concerns with substantial completion, the timing of obtaining the TCOs, or give the slightest indication of the existence of any condition which could or would give rise to an event of default.

44.    To the contrary, State Street and Gaia discussed open items such as the TCOs and substantial completion and State Street never once mentioned there was a problem with Gaia's progress or that it intended to hold Gaia in default or renege on its agreement to waive the Accrued Interest on the basis of any TCO or substantial completion related issues, as it later did.  For example, on September 22, 2010, Mr. Emslie sent Glauco Lolli-Ghetti from Gaia House an email stating "Substantial Completion - what is the process for declaring this. Will SKA sign a substantial completion form? When do you expect to declare?" and "TCO Open Items - We want assurance that these are being cleared over time -what is the process?"  A copy of the September 22, 2010 email is attached hereto as Exhibit E.

45.    State Street and its collection of consultants and advisors were kept up-to-date and were well aware of Gaia's progress, as to all aspects of the project, including the TCO's and substantial completion, and never once complained or gave any indication that Gaia was in default or that Accrued Interest would be owing.  State Street, through its actions and statements, indicated that there were no defaults or any condition which could or would give rise to an event of default.

46.    In reliance on State Street's behavior and the fact that State Street had agreed to waive the Accrued Interest, Gaia continued to work hard to finish Gaia House and pay State Street down.  Only after Gaia had completed the work which would result in State Street

being repaid, did State Street pull stale non-monetary defaults out of its back pocket and claim

that Gaia was in default and further claim that it would not waive the Accrued Interest.

**State Street's Statements from July 2010 Through February 2011 Do Not Show Accrued
Interest Being Added To The Principal Amount**

47.   In addition to the weekly construction meetings and bi-weekly calls with

State Street, Gaia also frequently spoke with Lindsay Jones, Jennifer Morris, Logan Benson and

Jennifer Ellis from Trimont, State Street's loan servicer.

48.   Trimont was responsible for sending out State Street's monthly statements

showing the total amount owed under the loan.

49.   A review of the monthly statements from July 2010 through February 2011

shows that deferred interest was not being added to the principal amount, or Accrued Interest

would if it were being charged.  In fact, the Accrued Interest was treated as an uncapitalized

deferred interest balance as opposed to capitalized deferred interest which would be added to the

principal amount.  This differs from the monthly State Street statements prior to the Third

Modification, before State Street agreed to waive the Accrued Interest, which clearly show the

capitalized deferred interest being added to the principal balance amount.  Copies of State

Street's Statements from March through April 2009 and July 2010 through February 2011 are

attached hereto as Exhibit F.

50.   Gaia relied on the monthly statements sent out by State Street's agent,

Trimont, showing the total amount owed under the loan.  Because Accrued Interest was not

being added to the principal balance in these monthly statements, Gaia had no reason to believe

that State Street would claim that Accrued Interest would be owing and, in fact, State Street's

intentional failure to include Accrued Interest to the principal balance on these monthly

statements was relied upon by Gaia for the fact that Accrued Interest would not be owing.

51.   As described above, Gaia's loan with State Street is a non-recourse loan. As a result, had Gaia known that State Street was reneging on its waiver of Accrued Interest, Gaia could have saved all the time, effort and money it spent in working on the project, leaving State Street with an unpaid loan, or Gaia could have secured additional financing to take out State Street's loan in the summer of 2010, before the additional Accrued Interest further accrued thereafter.

52.   When Gaia told Trimont that State Street provided them with a Notice of Default six months after the fact, a representative from Trimont stated that they were surprised that State Street waited so long to issue the default notice because in the other loans in the same portfolio which Trimont administered for State Street, State Street gave default notices immediately.

53.   State Street knowingly held off giving notice to Gaia because it wanted to induce Gaia to continue to work to bring in money so that State Street could be paid, but State Street had no intention of living up to its agreement to waive the Accrued Interest.

**Even After State Street Sent Its December 2 Notice of Default, It Still Acts As If No Defaults Have Occurred**

54.   By letter dated January 7, 2011, State Street permitted Gaia's fourth extension option, impliedly conceding that no default had occurred since an extension was not permitted if there was a default. Nevertheless, in the same letter, State Street asserted for the first time that it was not required to waive the payment of Accrued Interest set forth in the Third Modification based on the alleged "defaults." A copy of the January 7, 2011 letter is attached hereto as Exhibit G.

55.   However, by letters dated January 21, 2011 and February 22, 2011, State Street approved two draw requests by Gaia (draw request #38 for $399,088.96 and draw request

00431635

#39 for $171,447.91), again impliedly conceding that no default had occurred or was occurring. The January 21, 2011 letter is attached hereto as Exhibit H and the February 22, 2011 letter is attached hereto as Exhibit I.

56.    Thus, even if non-monetary defaults which had no effect on the repayment of the loan could somehow entitle State Street to renege on waiving the Accrued Interest, State Street encouraged Gaia to complete Gaia House while knowingly holding the alleged defaults in its back pocket.  Further, even after providing the Notice of Default, State Street acted as if the defaults did not exist and were not material.

**In March 2011, State Street Alleges For The First Time That It Should Be Paid Accrued Interest**

57.    On March 15, 2011, Gaia's affiliate advised State Street that it intended to exercise the Affiliate Buyout Provision to purchase the remaining three units at Gaia House at minimum sales prices pursuant to the Third Loan Modification.  A copy of the March 15, 2011 letter is attached hereto as Exhibit J.

58.    Thereafter, by letter dated March 24, 2011, State Street asserted that Gaia would need to distribute at least $8.6 million (the remaining principal balance of $4.1 million plus $4.5 million in claimed Accrued Interest) to State Street before Gaia could exercise its Affiliate Buyout Provision.  A copy of the March 24, 2011 letter is attached hereto as Exhibit K.

**The Non-Monetary Defaults Never Had Any Economic Impact On State Street or Gaia House's Completion By The Scheduled Maturity Date**

59.    Lenders place non-monetary covenants, such as the TCO and substantial completion covenants at issue here, to act as milestones for the borrower to meet in order to provide the borrower with the discipline to meet the covenants that really matter to the lender— the payment covenants.  In addition, lenders typically insist on inserting their representatives into borrower's periodic construction meetings, draw review processes and servicing relationships in

order to monitor all construction progress and borrower activities against such milestones in an effort to assess their projects and the condition of their collateral on a real-time basis, all to assure the lender that it will be paid. Potential issues are brought to borrowers' attention during the course of these interactions so that non-monetary issues do not ripen into monetary issues. Experienced third-party representatives, such as those State Street retained here, are involved and compensated to alert all parties to potential issues when a lender's collateral may become impaired or a payment covenant may be at risk. None of State Street's own representatives or its outside representatives ever during the many post July 15, 2010 meetings said or even indicated to Gaia that there were any non-monetary defaults, or defaults of any kind, even though it would have been their job and responsibility to do so to insure that there would be no possible payment defaults prejudicing State Street, another fact on which Gaia relied indicating that there were no defaults.

60.    Further, every payment covenant was met by Gaia. Every payment required to be made to State Street was made on time. The non-monetary covenants to which State Street pointed to justify reneging on its waiver of the Accrued Interest were immaterial to State Street's being repaid its loan.

61.    Moreover, each of the non-monetary loan covenants were included at iStar's request, not State Street's, and Gaia had no reason to believe State Street would enforce loan covenants that were created for the benefit of iStar, an experienced construction lender, as opposed to State Street, and which covenants were non-monetary and immaterial to payment.

62.    Neither State Street nor Gaia House suffered any economic or any other harm as a result of Gaia's alleged technical non-monetary defaults.

63. The failure to obtain the TCO on PH2 by July 15, 2010 had no impact on State Street because there was no buyer interested in the unit. Then on November 21, 2010 Gaia received an offer on PH2; on November 22, 2010 Gaia received the onsite inspection signoff for TCO on unit PH2; on December 1, 2010, Gaia sent State Street the TCO via email; on December 13, 2010 Gaia executed the agreement for the sale of PH2 and on December 23, 2010 Gaia closed on the sale of PH2 and State Street was paid its money. No economic harm was caused to State Street by the TCO issue.

**Rather Than Being Declared in Default, Gaia is Forced to Pay State Street the Disputed Accrued Interest**

64. Because Gaia invested almost all of its funds in Gaia House and has not recouped any of its equity, outside "take out" financing was the only route for Gaia to exercise its Affiliate Buyout Provision to acquire the remaining units at Gaia House, and thereby pay the $4.1 million legitimately remaining on the State Street loan.

65. In order for Gaia to be able close on its takeout loan, at which time Gaia would simultaneously pay down the full amount of its debt to State Street, Gaia needed to obtain a payoff letter from State Street and provide it to the takeout lender by July 15, 2011 (the maturity date of the loan).

66. State Street refused to give Gaia the payout letter unless it agreed to pay the disputed Accrued Interest.

67. Having no choice, on July 20, 2011, Gaia paid State Street $8.9 million, which included the disputed Accrued Interest of $4.5 million and the $4.1 million legitimately owing to State Street.

**State Street's Taking Of The Escrow Account**

68.    The Third Modification, *inter alia*, provided for the creation of a special "Condominium Unit Sales Escrow Account" ("Escrow Account") that expressly was dedicated to "… fund Project Costs which are set forth in the Project Budget … to complete the Project."

69.    Pursuant to the Third Modification, "Project Costs" refer to construction costs necessary to complete the Project.  These include amounts to be paid to the Construction Manager, Contractors and Vendors for work required to finish construction.  Such funds constitute trust funds under Section 70 of New York's Lien Law and cannot be used for any purpose unless and until applied to pay for monies due and owing to those who improve the value of the underlying real estate.

70.    On July 20, 2011, State Street participated in a Closing with Gaia where State Street's outstanding Loan was paid off in full, including the Accrued Interest amounts that were contested and remain under dispute.  Upon information and belief, State Street's Mortgage and Note were treated as paid and canceled.

71.    In addition, State Street kept the Escrow Account and refused to return it, in violation of the New York Lien Law.

72.    Pursuant to the New York Lien Law, any funds in the Escrow Account constitute trust funds and may not be used for any purpose other than, in the first instance, the payment of the "cost of improvement" (i.e. all labor and material costs incurred by persons improving the value of the underlying real estate) as defined in Lien Law Section 2(5); such funds should have been turned over to Gaia so that it could fund its unpaid obligations to various trust fund beneficiaries.

73.     State Street, despite having been paid all amounts due and owing it, and in violation of the New York Lien Law, has refused to release to Gaia the Escrow Account and in fact, continues to hold and thereby divert the funds therein, despite Gaia's repeated demands in connection with funding its Lien Law obligations.

74.     By virtue of the foregoing, State Street has violated, and remains in violation of the New York Lien Law, and its refusal to release to Gaia the Escrow Account constitutes an unlawful diversion of trust funds thereunder.

## AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION

### (Equitable Estoppel)

75.     Gaia repeats and realleges each and every allegation in paragraphs 1 through 74, as if fully set forth herein.

76.     State Street willfully concealed its true intention to renege on its waiver of Accrued Interest while making repeated misrepresentations to the contrary and omitting to disclose to Gaia that there were alleged defaults that it would be calling and as a result of which it would renege on its agreement to waive the Accrued Interest.

77.     State Street intended for Gaia to rely on those misrepresentations and omissions so Gaia would continue to develop Gaia House and provide for State Street to be paid and Gaia did so rely.

78.     In the meantime, State Street held the alleged defaults in its back pocket until State Street had utilized Gaia's time, resources and expertise to State Street's full benefit, without any regard for good faith and fair dealing.

79.     By virtue of the foregoing, State Street should be equitably estopped from relying on the alleged defaults to renege on its agreement to waive the Accrued Interest.

## AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION

### (Violation of the New York Lien Law)

80.   Gaia repeats and realleges each and every allegation in paragraphs 1 through 79, as if fully set forth herein.

81.   State Street, despite having been paid all amounts due and owing it, and in violation of the New York Lien Law, has refused to release to Gaia the Escrow Account and in fact, continues to hold and thereby divert the funds therein, despite Gaia's repeated demands in connection with funding its Lien Law obligations.

82.   State Street has violated, and remains in violation of the New York Lien Law, and its refusal to release to Gaia the Escrow Account constitutes an unlawful diversion of trust funds thereunder.

83.   By virtue of the foregoing, Gaia is entitled to judgment against State Street for the return of the Escrow Account.

### PRAYER FOR RELIEF

WHEREFORE, Gaia seeks judgment against State Street, as follows:

1.   On its first cause of action, judgment against Defendant in an amount to be determined at trial but in no case less than $4.8 million;

2.   On its second cause of action, judgment against Defendant for the immediate return of the Escrow Account;

Together with interest, attorney's fees and the cost and disbursements incurred in this action and such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

Dated: New York, New York
       September 12, 2011

DAVIDOFF MALITO & HUTCHER LLP

By:  *Larry Hutcher/OMR*
     Larry Hutcher

     lkh@dmlegal.com
     605 Third Avenue
     New York, New York  10158
     (212) 557-7200

     *Attorneys for Plaintiff*

GREENBERG, TRAGER & HERBST, LLP
     Todd L. Herbst
     therbst@gthny.com
     767 Third Avenue -12th Floor
     New York, NY 10017

     *Co-Counsel for Plaintiff*