**BINGHAM McCUTCHEN LLP**
One Federal Street
Boston, Massachusetts 02110
Andrew C. Phelan
Evan J. Benanti
Telephone: (617) 951-8000
*Attorneys for State Street Bank and Trust Company*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------
GAIA HOUSE MEZZ LLC,       x
                 :
           Plaintiff,      :
                 :
         - against -      :   Case No.:  1:11-cv-03186-TPG
                 :
STATE STREET BANK AND TRUST      :
COMPANY,               :   Hon. Thomas P. Griesa
                 :
           Defendant.     :
-----------------------------------------------------------------------x
STATE STREET BANK AND TRUST      :
COMPANY,               :
                 :
        Plaintiff in Counterclaim,     :
                 :
         - against -      :
                 :
GAIA HOUSE MEZZ LLC, YOUNG WOO,     :
MARGARETTE LEE and GLAUCO LOLLI-     :
GHETTI                    :
                 :
       Counterclaim Defendants.     :
-----------------------------------------------------------------------x

## PRETRIAL MEMORANDUM
## OF STATE STREET BANK AND TRUST COMPANY

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

I.   GAIA IS LIABLE FOR ACCRUED INTEREST .......................................... 2

    A.   Applicable Law ...................................................................................... 2

    B.   Gaia Failed To Earn the Accrued Interest Waiver By Committing Multiple Events of Default ................................................................................. 4

    C.   The Facts and Clear Contract Terms Refute Gaia's Equitable Estoppel Claim and Arguments .......................................................................... 7

        1.   There was No Concealment:  Clear Contract Terms Put Gaia on Automatic Notice Both of its Failure to Earn the Accrued Interest Waiver and of its Events of Default ............................................. 8

        2.   Gaia's Waiver, Estoppel, and Reliance Claims and Arguments are Meritless .................................................................................. 9

            a.   The contract required any waiver or modification to be in writing ................................................................................ 9

            b.   By extending the Maturity Date and continuing to fund construction State Street did not waive any rights or modify the contract .......................................................................... 10

            c.   Gaia's waiver, estoppel, and reliance arguments are barred by contract ........................................................................ 11

        3.   Gaia's Argument that its Continued Performance of its Existing Contractual Obligations Constitutes "Reliance" Fails as a Matter of Law ...................................................................................... 11

        4.   Gaia's Defaults Were Material .................................................. 12

II.  GAIA AND THE GUARANTORS ARE LIABLE FOR STATE STREET'S PROFESSIONAL FEES ............................................................................ 14

    A.   By Contract, Gaia and the Guarantors Must Pay State Street's Professional Fees, which are Debt under the Loan Documents ............................. 14

    B.   State Street's Professional Fees Are Reasonable ................................. 16

III. CLEAR CONTRACT AND STATUTORY TERMS DEFEAT GAIA'S CLAIM OF ENTITLEMENT TO THE PROJECT FUND ACCOUNT ..................... 20

    A.   Background ........................................................................................... 20

    B.   Gaia Has No Right to the PFA Funds Because State Street Is Not A Trustee Under The Lien Law Statute .................................................... 22

i

<u>TABLE OF CONTENTS</u>
(continued)

C.  Gaia Has No Right to the PFA Funds Because the PFA Does Not Hold Lien Law Trust Funds and Gaia's Events of Default Bar Gaia from Claiming Such Funds Until it Pays all Outstanding Debt Still Due ................... 24

D.  Even if They were Trust Funds, Gaia Has No Right to the PFA Funds Because State Street's Use of Them to Pay the Debt is a Proper Use under the NY Lien Law ................................................................................ 25

E.  Gaia Has $7.76 Million In Lien Law Trust Funds To Pay Contractors Without Violating State Street's Security Interest In and Depleting the PFA ................................................................................................................ 25

F.  Gaia Lacks Standing To Sue As To The PFA Funds Because Gaia is not a Trust Beneficiary and has Failed to Sue for any Beneficiaries in a Representative Capacity as Required by the NY Lien Law ............................... 26

IV.  RELIEF REQUESTED BY STATE STREET ............................................... 27

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*ALB Contracting Co. v. York-Jersey Mortgage Co.,*
    401 N.Y.S.2d 934 (N.Y. App. Div. 1978) .............................................. 22, 23

*In re AOL Time Warner Shareholder Deriv. Litig.,*
    2010 WL 363113 (S.D.N.Y.2010) .................................................................... 19

*Bank Leumi Tr. Co. v. D'Evori Int'l, Inc.,*
    558 N.Y.S.2d 909 (N.Y. App. Div. 1990) ...................................................... 11

*Blowers v. Lawyers Cooperative Publishing Co.,*
    526 F.Supp. 1324 (W.D.N.Y. 1981) ................................................................ 19

*Caledonia Lumber & Coal Co. v. Chili Heights Apartments,*
    417 N.Y.S.2d 536 (N.Y. App. Div. 1979) ...................................................... 23

*Canron Corp. v. City of New York,*
    652 N.Y.S.2d 211 (N.Y. 1996) ........................................................................ 22

*Caristo Constr. Corp. v. Diners Fin. Corp.,*
    289 N.Y.S.2d 175 (N.Y. 1968) ........................................................................ 22

*CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.,*
    2011 WL 4526132 (S.D.N.Y. Sept. 29, 2011) .............................................. 19

*City of Riverside v. Rivera,*
    477 U.S. 561 (1986) .......................................................................................... 17

*Cruden v. Bank of New York,*
    957 F.2d 961 (2d Cir. 1992) .............................................................................. 2

*E. Lincoln Realty Center v. Isley,*
    566 N.Y.S.2d 351 (N.Y. App. Div. 1991) ...................................................... 13

*In re Elm Ridge Assocs.,*
    234 F.3d 114 (2d Cir. 2000) ............................................................................ 23

*E*Trade Fin. Corp. v. Deutsche Bank AG,*
    374 Fed.Appx. 119 (2d Cir. 2010) .................................................................. 16

*Export-Import Bank of the U.S. v. Asia Pulp & Paper Co.,*
    232 F.R.D. 103 (S.D.N.Y. 2005) ...................................................................... 3

iii

*In re Fine Paper Antitrust Litigation,*

    751 F.2d 562 (3d Cir. 1984) ................................................................. 19

*Gesualdi v. Laws Const. Corp.,*

    759 F. Supp. 2d 432 (S.D.N.Y. 2010) ..................................................... 16

*Givoh Assocs. v. Am. Druggists Ins. Co.,*

    562 F.Supp. 1346 (E.D.N.Y. 1983) ........................................................ 23

*Hutton Const. Co. v. County of Rockland,*

    1993 WL 535012 (S.D.N.Y. 1993) ........................................................... 3

*John Doris, Inc. v. Solomon R. Guggenheim Found.,*

    618 N.Y.S. 2d 99 (N.Y. App. Div. 1994) ................................................. 2

*Maniolos v. U.S.,*

    741 F. Supp. 2d 555 (S.D.N.Y. 2010) ...................................................... 2

*Matusovsky v. Merrill Lynch,*

    186 F. Supp. 2d 397 (S.D.N.Y. 2002) ...................................................... 2

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,*

    906 F.2d 884 (2d Cir. 1990) ...................................................................... 2

*In re Musicland Holding Corp.,*

    374 B.R. 113 (Bankr. S.D.N.Y. 2007) ...................................................... 2

*New Colony Homes, Inc. v. Long Island Property Group, LLC,*

    803 N.Y.S.2d 615 (N.Y. App. Div. 2005) .............................................. 13

*N.Y. State Mortgage Loan Enforcement & Admin. Corp. v. Coney Island Five Houses, Inc.,*

    491 N.Y.S.2d 671 (N.Y. App. Div. 1985) .............................................. 10

*New York State Urban Devel. Corp. v. Marcus Garvey Brownstone Houses, Inc.,*

    469 N.Y.S.2d 789 (N.Y. App. Div. 1983) .............................................. 11

*Northern State Constr. Co. v. Robbins,*

    457 P.2d 187 (Wash. 1969) ..................................................................... 11

*Pecker Iron Works, Inc. v. New York Trades Council Ass'n of N.Y.C. Health Ctr. Inc.,*

    802 N.Y.S.2d 399 (N.Y. App. Div. 2005) .............................................. 24

*Pinnacle Envtl. Sys. Inc. v. R.W. Granger & Sons Inc.,*

    665 N.Y.S.2d 473 (N.Y. App. Div. 1997) .............................................. 26

*Readco, Inc. v. Marine Midland Bank,*

    81 F.3d 295 (2d Cir. 1996) ........................................................................ 3

A/74613130.6

*Silverblatt v. Morgan Stanley,*
    524 F. Supp. 2d 425 (S.D.N.Y.2007) .................................................... 19

*Southern Federal Sav. and Loan Ass'n v. 21-26 East 105th Street Assocs.,*
    145 B.R. 375 (S.D.N.Y. 1991) ......................................................... 3, 9

*In re Talik, Inc. Sec. Litig.,*
    576 F. Supp. 2d 570 (S.D.N.Y.2008) .................................................. 19

*Town of Hempstead v. Inc. Vill. of Freeport,*
    790 N.Y.S.2d 518 (N.Y. App. Div. 2005) ............................................. 3

*Utica Sheet Metal Corp. v. J.E. Schecter Corp.,*
    262 N.Y.S.2d 583 (N.Y. Sup. Ct. 1965) ............................................. 23

**Statutes** | **Page(s)**

N.Y. Lien Law §2 ....................................................................... 24, 25

N.Y. Lien Law §70 ..................................................................... 23, 24

N.Y. Lien Law §71 ......................................................................... 24

N.Y. Lien Law §77 ......................................................................... 26

**Other** | **Page(s)**

31 C.J.S. Estoppel and Waiver §112 (2011) ............................................ 3

A/74613130.6

# INTRODUCTION[1]

Gaia has sued State Street to recover Accrued Interest.  Gaia can prove no entitlement to the return of that interest.  The Accrued Interest Waiver was not a gift.  The contract said, very clearly, that Gaia had to earn the Waiver by committing no Event of Default after the date of the Third Modification (May 19, 2010) and the maturity date (July 15, 2011).  Gaia failed to earn the Waiver by committing several Events of Default, all of which the parties agreed were so important that they were "automatic" with no notice requirements and no period or right to cure.  After the Events of Default, State Street continued its proper effort to get Gaia to finish the project.  State Street acted, throughout, in a manner fully consistent with that effort and the contract terms.  Gaia can prove no conduct by State Street that is inconsistent with the contract or in any way inequitable or commercially unreasonable.  Gaia's efforts to claim entitlement to the Waiver simply ignore the facts and dispositive contract terms.

Similarly, the facts and clear contract terms make Gaia and the Guarantors liable for Professional Fees.  Gaia caused State Street to incur substantial Professional Fees by its own litigation tactics.  In clear contract terms, Gaia agreed to pay the Lender's Professional Fees, which are defined as Debt under the Loan.  Gaia's arguments repeatedly ignore or contradict clear and dispositive contract terms.  Based on those terms and the few facts that are relevant, judgment should enter for State Street and against Gaia.  Throughout this litigation, Gaia has made appeals to notions of "equity" and has tried to paint itself as a "wronged" party.  The facts show otherwise and, further, Gaia's objective is to have the Court to ignore or re-write the clear and dispositive contract terms that defeat all Gaia's arguments.  The Second Circuit has made clear that such efforts must be rejected:

> Under New York law, a written agreement is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed.  Construing an unambiguous contract provision is a

---

[1] This memorandum uses the short forms and capitalized terms as defined in the Memorandum In Support of State Street's Motion To Dismiss Gaia's Equitable Estoppel Claim (Doc. #42) or the contract.

1

> function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties may fairly be gleaned from the face of the instrument.

*Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992). Specifically, the Second Circuit has cautioned against the efforts Gaia has undertaken here to try to have the Court ignore the dispositive contract terms, stating that a:

> court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.

*Id.; accord Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889-90 (2d Cir. 1990). The Second Circuit has noted, in fact, that it would be both inconsistent with contract principles and inequitable to deny lenders their bargained-for rights that are clearly stated in contract documents. *Metropolitan Life*, 906 F.2d at 889-90. The Court should reject here Gaia's efforts to have it disregard the unambiguous and dispositive contract terms.

## I.    GAIA IS LIABLE FOR ACCRUED INTEREST

### A.    Applicable Law

The interpretation of unambiguous contract terms is for the court as a matter of law. *Maniolos v. U.S.*, 741 F. Supp. 2d 555, 565-66 (S.D.N.Y. 2010). The court must "give effect to the parties' intent as revealed in the language that they used." *In re Musicland Holding Corp.*, 374 B.R. 113, 119-20 (Bankr. S.D.N.Y. 2007); *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002). A party seeking to evade clear contract obligations to escape the bargain it signed may not substitute clear requirements with its own notions of "equity." *Metropolitan Life*, 906 F.2d at 889-90; *accord, Cruden*, 957 F.2d at 976; *John Doris, Inc. v. Solomon R. Guggenheim Found.*, 618 N.Y.S. 2d 99, 100 (N.Y. App. Div. 1994) ("courts may not rewrite the agreement to relieve a sophisticated contracting party from terms that it later deems disadvantageous"). Gaia is liable for Accrued Interest because it failed to earn the Waiver by satisfying the condition that no Event of Default occur before maturity. Gaia cannot rewrite the contract to erase this negotiated and unambiguous condition precedent or by invoking "equity" in

order to deprive State Street of its contract rights. *Musicland*, 374 B.R. at 119-21; *John Doris* 618 N.Y.S. 2d at 100.

The sole count addressing Accrued Interest in Gaia's Amended Complaint claims equitable estoppel. To prove this claim, Gaia must demonstrate that (1) State Street concealed a material fact; (2) State Street intended for Gaia to rely on such concealment; (3) Gaia lacked knowledge of the true facts; and (4) Gaia justifiably and detrimentally relied on the concealment. *Readco Inc. v. Marine Midland Bank*, 81 F.3d 295, 301-02 (2d Cir. 1996). Gaia cannot prove any of the four estoppel elements because the facts, including the clear contract terms, demonstrate that there was no concealment, Gaia knew the true facts, and that Gaia suffered no detrimental reliance. Gaia's arguments fail under the facts, dispositive contract terms, and well-established principles of law.

New York law also refutes Gaia's argument challenging State Street's actions because those actions were fully consistent with State Street's rights and obligations under the contract. An estoppel claim fails where it challenges a party's conduct that is consistent with that party's contractual obligations. *Southern Federal Sav. & Loan Ass'n v. 21-26 East 105th Street Assocs.*, 145 B.R. 375, 381 (S.D.N.Y. 1991) (an estoppel claim cannot challenge conduct consistent with parties' contract) (citing *Rose v. Spa Realty Assocs.*, 397 N.Y.S.2d 922, 927 (N.Y. 1977)).

Further, there was no cognizable reliance here. A party claiming estoppel must prove it prejudicially changed its position in reliance on the alleged concealment and that this reliance was justified. *Southern Federal*, 145 B.R. at 382; *Town of Hempstead v. Inc. Vill. of Freeport*, 790 N.Y.S.2d 518, 520 (N.Y. App. Div. 2005) (citations omitted). A party cannot show detrimental reliance by claiming it was induced to perform what was already an existing legal duty:

> The doctrine of estoppel has no application in cases where the representations or conduct which are claimed to give rise to it tend only to induce the party to do some act which he is already legally bound to do.

A/74613130.6

31 C.J.S. ESTOPPEL AND WAIVER §112 (2011) (citing *Organ v. Stewart*, 60 N.Y. 413 (1875).[2]

Here, the "reliance" Gaia claims -- staying on the Project -- fails because it reflects nothing more

than Gaia's pre-existing legal obligation under clear terms in the Loan Documents.

**B.     Gaia Failed To Earn the Accrued Interest Waiver By Committing Multiple Events of Default**

Section 1.2(a) of the Loan Agreement required Gaia to <u>earn</u> the Accrued Interest Waiver

by committing no Event of Default before maturity.  Section 1.2(a) clearly stated:

> On the Maturity Date, the entire Debt, if not sooner paid, shall become due and payable in full.  Notwithstanding the foregoing, if the entire Debt, other than …
> [Accrued Interest], is paid in full on the Scheduled Maturity Date <u>and no Event of Default occurs prior to such Scheduled Maturity Date, Lender shall waive the payment of Accrued Interest from Borrower.</u>  [emphasis added]

Gaia committed multiple Events of Default before the Maturity Date, any one of which

disqualified Gaia from earning the Waiver.[3]  Each of these Events of Default was "automatic"

under §11.1 if the Loan Agreement, which stated:

> It being understood and agreed that if any event or circumstance occurs or exists which is an Event of Default under any one subsection of subsections (a) through (x) (inclusive) of this Section 11.1, then an "Event of Default" under the Loan Documents shall automatically exist.

Second Modification at 16 (§11.1); Loan Agreement at 58 (§11.1).  The parties negotiated that

such failures by Gaia were so significant that they would, by mere virtue of their occurrence, be

"Events of Default" and, further, that they would be "automatic," with no notice requirement and

---

[2] *Accord Export-Import Bank of the U.S. v. Asia Pulp & Paper Co.,* 232 F.R.D. 103, 109-110 (S.D.N.Y. 2005) (party cannot assert estoppel for being "induced" to do what he already was legally required to do); *Hutton Const. Co. v. County of Rockland*, 1993 WL 535012, at *9 (S.D.N.Y. 1993) (same) (citing *Organ v. Stewart*).

[3] "Accrued Interest" is the interest that would accrue on the $22,780,533 "Principal Balance at Initial Maturity Date" between July 1, 2009 and the July 15, 2011 Maturity Date.  Second Modification at 6 (defining Initial Maturity Date); Third Modification at 4-5 (defining "Principal Balance at Initial Maturity Date" & §1.2(a)).  Despite failing to earn the Waiver, Gaia claims entitlement to pay no interest on the $22.7 million amount for the two-year period from July 1, 2009 to July 20, 2011.

no opportunity for Gaia to cure.[4]  These negotiated terms reflect the significance of those Events of Default regarding the parties' contractual rights -- and are not surprising given how Gaia had repeatedly failed to meet contract deadlines over the preceding two years.  Timely performance of these obligations after Gaia's extended and repeated delays were central contractual obligations.  Gaia's Events of Default at issue here were as follows and will be referred to by the following designated short forms:

(1) **"Substantial Completion Default"**  Gaia failed to achieve Substantial Completion by the Required Completion Date, which was July 15, 2010.  This was an automatic Event of Default under §11.1(m) of the Loan Agreement.  *See* Second Modification at 15 (text of §11.1(m)); Third Modification at 4 (July 15, 2010 was the Required Completion Date).

(2) **"TCO Default"**  Gaia failed to obtain a copy of the TCO for Penthouse 2 by July 15, 2010.  This was an automatic Event of Default under §11.1(v) of the Loan Agreement.  *See* Third Modification at 8.

(3) **"Principal Paydown Default"**  Gaia failed to pay down all principal by June 30, 2011.  This was an automatic Event of Default under §7.34 of the Loan Agreement (*see* Third Modification at 7) and under §11.1(a) of the Loan Agreement.

(4) **"Loan Maturity Default"**  Gaia failed to pay off the Debt in full by the July 15, 2011, Maturity Date.  This was an automatic Event of Default under §1.2 (*see* Third Modification at 5) and §11.1(a) of the Loan Agreement.[5]

(5) **"Project Consultant Default"**  Gaia excluded State Street's Project Consultant from project construction meetings on and after April 26, 2011.  This was an automatic Event of Default under 11.1(r) and §6.2(a) of the Loan Agreement.[6]

The contract terms relevant to Gaia's Events of Default in paragraphs (2) through (5)

---

[4] Of the Events of Default at issue here, only the Principal Paydown Default under §7.34 and 11.1(a) had a cure period.  Gaia attempted no cure during that period.

[5] The Maturity Date was the date when Gaia's final payment of any outstanding Debt became due.  Loan Agreement at A-13.  The original "Scheduled Maturity Date" was July 1, 2009.  *Id.* at A-20.  Gaia exercised four contract options to extend the Maturity Date as long as possible, ultimately to July 15, 2011.  Gaia had no corresponding right to extend the Required Completion Date, which always remained July 15, 2010.

[6] Section 6.2(a) states that, "If requested by Lender, Borrower shall, or shall cause Project Owner to, invite Lender's Project Consultant to participate in all scheduled construction meetings between a Loan Party and a Contractor Party."  Section 11.1(r) makes it an automatic Event of Default if Gaia "shall interfere with the exercise of Lender's rights or remedies under the Loan Documents".

A/74613130.6

above are largely self-explanatory.   The contract terms and facts regarding the Substantial Completion Event of Default in paragraph (1) above warrant further discussion here.   The contract defines "Substantial Completion" as "the satisfaction of all the conditions" listed in §5.2(j) of the Loan Agreement.   Section 5.2(j) lists nine specific conditions that Gaia was required to demonstrate to fulfill Substantial Completion.   Gaia simply ignored those clear requirements -- during the project and in this litigation.   To demonstrate Substantial Completion, Gaia had to provide State Street with the following nine items:

   i.   certificates from each of Borrower, Architect and Lender's Project Consultant certifying . . . completion of the entire Project (other than Punchlist Items[)] in accordance with the Plans and Applicable Law;

   ii.   a written acknowledgement from Senior Lender to Lender that all work (other than the Punchlist Items) required under the Senior Loan Documents in connection with the Project has been completed;

   iii.   three (3) copies of an "as-built" Survey of the Project, showing no encroachments or other matters objectionable to Lender, and three (3) copies of complete "as-built" Plans for the Project;

   iv.   copies of the temporary certificate or certificates of occupancy for the entire Project and each and every portion thereof, together with all other licenses and permits necessary for the use and occupancy of the Project and each and every portion thereof;

   v.   a final "comprehensive endorsement" to the Title Policies;

   vi.   final lien waivers from the General Contractor and all other contractors, subcontractors and materialmen (on all tiers) claiming by, through or under the General Contractor;

   vii.   an update of the UCC Searches showing no matters which are not Permitted Exceptions;

   viii.   evidence that Borrower has obtained, or has caused Project Owner to obtain, the insurance required under the Loan Documents . . . upon Substantial Completion; [and]

   ix.   the approval of the sureties under the Payment and Performance Bonds . . . .

Loan Agreement §5.2(j).  Gaia did not provide to State Street by the July 15, 2010 Required Completion Date a single one of the nine required items listed above.  Gaia never satisfied the these requirements to demonstrate Substantial Completion even by the maturity date a year later in July 2011.

Instead, in April 2011, Gaia tried to create its own non-contractual notion of substantial completion by drafting a "certificate" on April 5, 2011, that stated that Substantial Completion was achieved back on May 17, 2010. This assertion is demonstrably false. The Third Modification was effective on May 19, 2010 -- two days after this "certificate" claimed substantial completion. The recitals on page 2 of the Third Modification admit that, as of May 19, 2010, several defaults existed under the Loan Agreement, including that TCOs for condominium units "4S, 4N, 11S, PH1 and PH2 have not been issued and as a result an Event of Default exists under Sections 11.1(u) and (v) of the Loan Agreement." Third Modification at 2. One of the clear conditions listed above to prove Substantial Completion was that TCOs had to have been issued "for the entire Project and each and every portion thereof". Loan Agreement §5.2(j). The Third Modification admits that, as of May 19, 2010, at least five required TCOs had not been issued, which demonstrates the falsity of Gaia's "certificate" claiming Substantial Completion on May 17, 2010 (even without considering the other eight requirements of §5.2(j) that Gaia failed to satisfy).

### C.     The Facts and Clear Contract Terms Refute Gaia's Equitable Estoppel Claim and Arguments

Throughout its performance on the Project, State Street has acted properly and in a manner fully consistent with the contract. Both before and after Gaia's Events of Default, State Street's efforts were directed at getting the project completed by fulfilling State Street's contractual obligations and getting Gaia to fulfill Gaia's obligations. Throughout, and including between July and December 2010, State Street continued its communications with Gaia to get Gaia to complete construction and obtain the required certificates and government approvals. State Street continued to have calls with Gaia, including with Glauco Lolli-Ghetti, about sales and marketing efforts and construction progress. State Street also continued to send Greg Rutherford, State Street's Project Consultant, to the Project for site visits and to attend monthly construction meetings in order to monitor construction and project developments and to prepare monthly reports. State Street continued to review and approve Gaia's continuing construction

funding draw requests.  In short, State Street continued performing all its contractual obligations, all with the objective of getting the Project to completion.  This performance by State Street continued from July 2010 through the July 2011 maturity date, and even included agreements despite Gaia's Events of Default, to extend the Maturity Date of the Loan and to continue to fund Gaia's requests for construction advances.  That Gaia ignored clear contractual obligations, or, now, repeatedly dismisses them as "technical," shows only that Gaia thought little of the commitments it made in its contracts and, having failed them, seeks to dismiss them as meaningless.  State Street, by contrast, complied at all times complied with its contractual obligations, gave Gaia ever opportunity it could to perform.  There was nothing improper, commercially unreasonable, or inequitable in how State Street conducted itself, much less anything that, according to Gaia, was deceptive or concealed anything about State Street's clear rights under the contract.

> **1.** **There was No Concealment:  Clear Contract Terms Put Gaia on Automatic Notice Both of its Failure to Earn the Accrued Interest Waiver and of its Events of Default**

Gaia claims State Street had to give Gaia "notice" of its Events of Default.  The contract refutes this claim.  Section §11.1 of the Loan Agreement made the Events of Default "automatic" with no notice requirement:

> if any event or circumstance occurs or exists which is an Event of Default under any one subsection of subsections (a) through (x) (inclusive) of this Section 11.1, then an "Event of Default" under the Loan Documents <u>shall automatically exist</u>.

All Gaia's Events of Default were under §§11.1(a)-(x).  Accordingly, they all automatically existed upon their occurrence and Gaia was on full "notice" of them by the very terms of the contract it had signed.

As to Accrued Interest, §1.2(a) informed Gaia the instant Gaia committed each automatic Event of Default that it had failed to satisfy the no-default condition precedent needed to earn the Accrued Interest Waiver.  Whether and when State Street exercised any remedy at all for Gaia's Events of Default is irrelevant to Gaia's disqualification from the Waiver because, by

committing each Event of Default, Gaia failed to meet the no-default condition precedent to earn the Waiver.

Gaia's claim reduces to a complaint that, when Gaia committed each Event of Default, State Street had to give Gaia notice or take some remedial action. The automatic Event of Default provisions belie Gaia's claim that notice was required and multiple clear contract terms defeat Gaia's complaint that State Street should have exercised some default remedy. The contract clearly stated that, upon the occurrence of any Event of Default, State Street could "take such action, <u>without Notice or demand</u>, as Lender deems advisable to protect and enforce its rights against Borrower and in the Collateral". Loan Agreement §11.3(a). As to timing, §11.3(a) allowed State Street to take action (or not take any immediate action) in any order and at any time it chose without waiving or impacting any of its broad remedial rights. Specifically, §11.3(a) stated that State Street could take its actions

> concurrently, separately or otherwise, at such time and in such order as Lender may determine, in its sole and absolute discretion, without impairing or otherwise affecting the other rights and remedies of Lender . . . .

*Id.* Thus, the contract allowed State Street, upon an Event of Default, to take immediate action or to take no action at all and the timing or order of State Street's actions did not waive any of its rights as to the actions it could take or their timing.

### 2. Gaia's Waiver, Estoppel, and Reliance Claims and Arguments are Meritless

#### a. The contract required any waiver or modification to be in writing

Section 12.7 states that any "waiver in any instance or under any particular circumstance shall not be effective unless in writing . . . ." Similarly, §12.11 states that State Street cannot waive any right except in writing:

> Under no circumstances shall Lender be deemed to have waived any provision of any Loan Document unless Lender has expressly waived such provision in writing. Without limiting the foregoing, the failure of Lender to insist upon strict performance of any term hereof, shall not be deemed to be a waiver of such term or any other term of this Agreement or the other Loan Documents.

A/74613130.6

Section 12.11 also states that any modification to the terms of the Loan Agreement must be in a writing signed by Gaia and State Street:

> <u>Modification</u>.   This Loan Agreement may not be modified, amended or terminated, except by an agreement in writing executed by Lender and Borrower.   Borrower acknowledges that the Loan Documents set forth the entire agreement and understanding of Lender and the Loan Parties with respect to the Loan and that no oral or other agreements, understandings, representations or warranties exist with respect to the Loan other than those expressly set forth in the Loan Documents. . . .

State Street's alleged silence and continued performance did not, indeed, could not, modify or waive its right to Accrued Interest.   Section 13.4 of the Loan Agreement precluded Gaia from any unilateral cure of its defaults.   To be excused from paying Accrued Interest, then, Gaia had to get either a written waiver or written modification signed by both parties under §12.11 and §12.7.   Because there were no such writings, Gaia remained liable for Accrued Interest under §1.2(a).   *See Southern Federal Sav. & Loan Ass'n v. 21-26 East 105th Street Assocs.,* 145 B.R. 375, 381-82 (S.D.N.Y. 1991); *accord N.Y. State Mortgage Loan Enforcement & Admin. Corp. v. Coney Island Five Houses, Inc.,* 491 N.Y.S.2d 671, 673 & 675-76 (N.Y. App. Div. 1985) (rejecting defenses and counterclaims that were negated by the parties' contract, which required any waiver or modification to be in writing).

> **b.     By extending the Maturity Date and continuing to fund construction State Street did not waive any rights or modify the contract**

Gaia claims State Street cannot collect Accrued Interest on waiver or estoppel grounds because State Street extended the Maturity Date of the Loan after Gaia's Events of Default.   This claim contradicts §11.3(f)(iii), which states:

> Neither Borrower nor any other Loan Party shall be relieved or released from its Obligations by reason of … (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Loan Documents.

Gaia also claims State Street waived or is estopped from collecting Accrued Interest because State Street continued to fund Advances to pay for construction costs after Gaia's Events

of Default.  This claim contradicts §11.3(a)(iii), which allows, but does not require, the Lender to stop making Advances as one of the Lender's many discretionary remedies for an Event of Default.  It does not require such action and continued funding is expressly not a waiver under §12.7, §12.11, and, in particular, §11.3(a) in that it gave the Lender broad discretion as to whether and when to exercise any of its options with full reservation of all its rights and remedies.

**c.      Gaia's waiver, estoppel, and reliance arguments are barred by contract**

Section 11.3(f) explicitly bars Gaia from claiming waiver, estoppel, or reliance based on the timing or order in which the Lender exercises its remedies, including, for example, the alleged "delay" as to Gaia's July 15, 2010, Substantial Completion Default and TCO Default. Section 11.3(f) states:

> The failure of Lender to insist upon strict performance of any term, covenant or condition contained herein or in the other Loan Documents <u>shall not be deemed to be a waiver, modification, amendment or estoppel thereof and no Loan Party or other Person shall be entitled to rely on such action or inaction</u>.

This explicit contractual bar defeats the claims and arguments Gaia asserts in this lawsuit.

**3.      Gaia's Argument that its Continued Performance of its Existing Contractual Obligations Constitutes "Reliance" Fails as a Matter of Law**

Gaia claims as reliance its continued performance of its existing contractual obligations, namely, that, had it known that State Street would seek to collect Accrued Interest, Gaia would have walked off the project.  This assertion -- even if it were true -- fails under clear New York law because continuing work under the Loan Agreement was Gaia's pre-existing legal obligation. *See Bank Leumi Tr. Co. v. D'Evori Int'l, Inc.*, 558 N.Y.S.2d 909, 916 (N.Y. App. Div. 1990) (finding party cannot claim inducement in doing what he is already obligated to do); *New York State Urban Devel. Corp. v. Marcus Garvey Brownstone Houses, Inc.*, 469 N.Y.S.2d 789, 794 (N.Y. App. Div. 1983) (same); *Northern State Constr. Co. v. Robbins*, 457 P.2d 187, 190 (Wash. 1969) (same).  Gaia's legal obligation was to complete construction.  Indeed, §6.1(a)

11

of the Loan Agreement established this duty as Gaia's primary Loan covenant.  That Gaia claims it would have intentionally breached that obligation and walked off the job does not change the fact that completing construction was its pre-existing legal obligation.

### 4.      Gaia's Defaults Were Material

Gaia also tries to excuse its own Events of Default by claiming that they were immaterial and "non-monetary."  This argument fails for the obvious reason that Gaia included those supposedly "technical" or "non-monetary" Events of Default in the contract and is a patently improper attempt to re-write the terms of the contract Gaia negotiated.  Indeed, what Gaia is arguing is that Gaia itself thought so little of these clear contractual deadlines to which it committed that it could unilaterally ignore them regardless of what Gaia committed to achieve by contract.

Further, other clear contract terms refute this assertion.  Timely completion by the Required Completion Date was so material to the contract that it appears in the contract as the first covenant to which Gaia committed.  Specifically, in §6.1(a) of the Loan Agreement, Gaia covenanted to ensure "that Substantial Completion occurs by the Required Completion Date".  Gaia admitted the materiality of that deadline by agreeing that "the Required Completion Date is absolute and will not be extended or re-set to a later date."  Loan Agreement §6.1(a).  When Gaia failed to achieve it, the Lender accommodated Gaia's failures and set clear deadlines at later dates.  These remained explicitly material.  Gaia re-affirmed this §6.1(a) covenant in each Modification Agreement when -- because of Gaia's repeated project failures and failures to meet deadlines -- State Street extended the Required Completion Date.  Second Modification §12 (ratifying and confirming all covenants in Loan Agreement except as modified); Third Modification §13 (same).

That all the deadlines at issue here were material is further demonstrated by the fact that the parties included them as clear contractual obligations in the contract <u>and</u> contracted that any Gaia failure to achieve them was so significant that it would be an <u>automatic</u> Event of Default

12

with no right to notice and no opportunity to cure.  *See* Loan Agreement §§ 11.1(a), 11.1(m), 11.1(v), 11.3(d), 13.4.  In this regard, §11.3(d) said:

> No Obligation to Accept Cures.    Once an Event of Default has occurred hereunder, Lender shall be under no obligation to accept a subsequent attempt by Borrower or any other Person to cure same.

Similarly, §13.4 said:

> No Waiver of Event of Default. … once an Event of Default has occurred … any cure effected by any Loan Party or any other Person … shall only be applicable to the determination of whether a Partial Recourse Event or a Full Recourse Event has occurred, but shall not be deemed a cure of such Event of Default and shall not constitute a waiver of, and shall in [sic] not limit, Lender's rights and remedies in respect of any Event of Default, including Lender's right to accelerate the Debt and realize on the Collateral.

Further, the contract repeatedly stated that "time is of the essence of each provision of this Agreement".   Third Modification §18; *accord* Second Modification §19; Loan Agreement §12.29.  Even standing alone, such clauses make contractual deadlines material.[7]  Here, there is much more:  the several additional provisions cited above demonstrate by clear contractual provisions that the contractual deadlines were material.  Finally, §12.15 of the Loan Agreement demonstrates the materiality of the deadlines and Gaia's obligation to meet them and, further, bars Gaia's various efforts to blame the economy, the bankruptcy of its own subcontractors, or other grounds for its performance failures.  Section 12.15 states as follows:

> Absolute and Unconditional Obligation.    Borrower and each Joinder Party acknowledge that the payment and performance of the Obligations in accordance with the provisions of this Loan Agreement and the other Loan Documents is and shall at all times continue to be absolute and unconditional in all respects, and shall at all times be valid and enforceable irrespective of any other agreements or circumstances of any nature whatsoever which might otherwise constitute a defense to this Loan Agreement or any other Loan Document or the Obligations or otherwise with respect to the Loan.

---

[7] *New Colony Homes, Inc. v. Long Island Property Group, LLC*, 803 N.Y.S.2d 615, 616 (N.Y. App. Div. 2005) ("where time is of the essence, performance on the specified date is a material element of the contract, and failure to perform on that date constitutes, therefore, a material breach of the contract"); *E. Lincoln Realty Center v. Isley*, 566 N.Y.S.2d 351, 352 (N.Y. App. Div. 1991) (party must strictly comply with "time is of essence" clause).

## II.   GAIA AND THE GUARANTORS ARE LIABLE FOR STATE STREET'S PROFESSIONAL FEES

Like its challenge to Accrued Interest, Gaia's and the Guarantors' challenge to payment of State Street's Professional Fees seeks to ignore clear contract terms.  It also seeks to ignore the fact that it is Gaia's own litigation tactics in raising repeated challenges to its liability for Accrued Interest that ignore and contradict dispositive contract terms that have caused State Street to incur substantial Professional Fees.

### A.   By Contract, Gaia and the Guarantors Must Pay State Street's Professional Fees, which are Debt under the Loan Documents

When State Street exercises its contract Remedies upon an Event of Default, "any and all costs and expenses, including Professional Fees, paid or incurred by Lender" are deemed "Protective Advances" under the contract.  Loan Agreement §11.3(a).  In §11.3(c), Gaia and the Guarantors explicitly agreed that State Street could

> appear in, defend, or bring an action or proceeding to protect its interest in the Project or to collect the Debt, and the cost and expense thereof (including Professional Fees), <u>shall constitute a Protective Advance</u> and shall be payable on demand.

The "<u>Debt</u>" includes Accrued Interest, Default Interest, and Professional Fees.  *Id.* at A-6. "Professional Fees" include "all reasonable fees, costs and expenses of attorneys . . . advisors and consultants".  *Id.* at A-17.  Thus, the Professional Fees incurred in this action to collect Gaia's Debt are Protective Advances.  Gaia agreed to pay all such Protective Advances on demand:

> Borrower covenants and agrees to immediately pay Lender on demand all costs and expenses, including Professional Fees, incurred by Lender in connection with or as a consequence of any of the following (each a "Protective Advance"): (i) any Unmatured Default or Event of Default under the Loan Documents ... ([iii]) the collection of the Debt, (iv) the enforcement of Lender's rights and remedies under the Loan Documents . . . .
>
> All Protective Advances made by Lender under the Loan Documents shall be evidenced by, and be deemed to be advanced as principal under, the Note . . . and shall be due and payable on demand.

*Id.* §12.22(a).

A/74613130.6

The Guarantors are liable to pay these amounts under the Guaranty of Recourse Obligations dated December 8, 2006 ("Recourse Guaranty"). The Guarantors are Glauco Lolli-Ghetti, Margarette Lee, and Young Woo. The Recourse Guaranty makes each Guarantor jointly and severally liable for "the full and prompt payment and performance of all the Guaranteed Obligations." Recourse Guaranty §1.1. "Guaranteed Obligations" include "the sum of (i) all Losses plus (ii) all Enforcement Costs." *Id.* §1.3(iv) The Guarantors were required to pay these Guaranteed Obligations within ten days after demand by State Street in writing. *Id.* §1.1. State Street has made demands for payment, which the Guarantors have ignored.

The Guarantors must pay all Guaranteed Obligations upon the occurrence of a "Partial Recourse Event," which term the contract defines as follows:

> Borrower shall be personally liable for any Losses suffered, incurred or expended by Lender (including Lender's reasonable attorney's fees), and Borrower does hereby agree to pay, reimburse, indemnify, defend and hold Lender harmless from and against any such Losses, arising out of or attributable to any of the following events (each a "**Partial Recourse Event**"):
>
> .... (vi) contesting the validity or enforceability of the Loan Documents; provided, however, Borrower shall be permitted to allege and prove that no Event of Default has occurred and that the Borrower is in full compliance with the Loan Documents, further provided, however, that liability for this subsection shall be limited only to Lender's reasonable attorneys' fees arising from such contest ....

Loan Agreement §13.2.[8] Gaia committed Partial Recourse Events beginning as early as January 2011 and continuing in this litigation by challenging the occurrence of Gaia's Events of Default, contesting the validity and enforceability of the Loan Documents as to Accrued Interest and Professional Fees, and contesting Lender's right to hold the Project Fund Account. Given the occurrence of these Partial Recourse Events, the Guaranteed Obligations include both Losses and "Enforcement Costs", which latter term the Recourse Guaranty defines to include legal expenses and attorneys' fees:

---

[8] The contract defines "Losses" to include all manner of liabilities, "including Professional Fees and other costs of defense" arising out of, incurred because of, or related to, any "Recourse Event." Loan Agreement at A-12. "Recourse Event" means any Partial or Full Recourse Event. *Id.* at A-18. The contract defines "Collateral" to mean "any and all property . . . described in the Loan Documents as being assigned, pledged or transferred to Lender by any Loan Party as security for the Obligations." *Id.* at A-5.

> (b) incurred or paid by Lender in protecting Lender's interest in the Collateral as a result of the occurrence of a Partial Recourse Event ... or (c) incurred in collecting any amount payable under this Guaranty or the other Loan Documents as a result of the occurrence of a Partial Recourse Event... or (d) incurred in enforcing Lender's rights under this Guaranty or with respect to the Collateral.... Enforcement Costs shall include any of the foregoing incurred following the (i) exercise of any remedy by Lender under this Guaranty or the other Loan Documents or following the occurrence of an Event of Default ... or (iv) enforcement of any obligations of or collection of any payments due from Guarantor under this Guaranty, the other Loan Documents or with respect to the Collateral.

Recourse Guaranty §1.3(iii).

The Guarantors are also liable for State Street's Professional Fees, with Default Interest, as Protective Advances that are owed by Gaia. Specifically, the contract states:

> If Lender makes any Protective Advance for the payment of any Guaranteed Obligations, Guarantors hereby agree to pay to Lender the amount of such Protective Advance upon demand from Lender, together with interest thereon at the Default Rate from the date of such Advance until repayment to Lender in full. The repayment of such amounts to Lender are part of the Guaranteed Obligations.

Recourse Guaranty §1.4. Events of Default under the Recourse Guaranty are defined in §5.1 to include, among other things, (a) any violation, default or breach under Section 1.1 of the Guaranty or (b) any Event of Default under §11.1 of the Loan Agreement or any other Loan Document. Recourse Guaranty §§ 5.1(i) & 5.1(ix).[2]

State Street made written demands for payment to Gaia and each Guarantor by 2011 letters dated September 22, October 2, and November 30, totaling $198,592 accrued between July and the end of October 2011. Additional amounts have accrued for November and will continue to accrue in this litigation. Gaia and the Guarantors have ignored these notices.

## B.    State Street's Professional Fees Are Reasonable

State Street's Professional Fees incurred are reasonable and largely attributable to Gaia's aggressive and repetitive litigation tactics that also -- and repeatedly -- posit arguments that

---

[2] All of the provisions cited in this section above make it "unmistakably clear" in the Loan Documents that the parties intended for the Lender to recover its attorneys' fees and other Professional Fees from Gaia and each Guarantor. *See E\*Trade Fin. Corp. v. Deutsche Bank AG*, 374 Fed.Appx. 119, 123-24 (2d Cir. 2010) (affirming award of attorneys' fees where contract language supporting such recovery was unmistakably clear).

ignore or directly contradict dispositive contract terms. That a party actually paid the fees it seeks to recover demonstrates the reasonableness of the fee amounts because it shows what a litigant was in fact willing to pay for the services rendered and avoids the need to speculate as to what a litigant might be willing to pay. *Cf. Gesualdi v. Laws Const. Corp.*, 759 F. Supp. 2d 432, 445 (S.D.N.Y. 2010) (noting that a presumptively reasonable fee is "what a reasonable paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively").

Gaia's aggressive and repetitive litigation strategy also demonstrates the reasonableness of State Street's Professional Fees. An opponent's litigation tactics are very relevant in considering the reasonableness of the time expended. *City of Riverside v. Rivera*, 477 U.S. 561, 581 n.11 (1986). Indeed, the U.S. Supreme Court has recognized that a party cannot litigate tenaciously and then be heard to complain about the time necessarily spent by its opponent in response. *Id.* Here, Gaia commenced the litigation in April 2011 with a complaint in New York state court. State Street removed the case to federal court and moved to dismiss. Extensive briefs and declarations were filed by both parties. That dispositive motion was ripe for decision on June 16, 2011. Rather than seek resolution of that motion, Gaia next filed a motion for a preliminary injunction. Indeed, Gaia rejected State Street's efforts to get the ripe dispositive motion heard on the merits, demanding instead that the entire matter be re-briefed and heard on the preliminary injunction proceedings. The injunction motion was then extensively briefed, including 420 pages of sworn declaration testimony and exhibits. A significant part of that motion -- addressing likelihood of success on the merits -- addressed the central merits issue raised in the then-pending dispositive motion. Judge Barbara Jones heard the preliminary injunction during an extended oral argument on June 30, 2011. Judge Jones denied the preliminary injunction motion, including finding that Gaia had no likelihood of success on the merits.

Then, on the eve of the loan maturity, Gaia unilaterally -- and without leave of court -- purported to dismiss its lawsuit despite the pendency of the dispositive motion and the extensive

proceedings that had then been held.  As explained in State Street's opposition to that improper dismissal, this Gaia dismissal was a strategic tactic the purpose of which was to try to force State Street to release its lawful contractual security interest in the Project Fund Account escrow on the maturity of the loan in July 2011, while Gaia intended simply to re-file the lawsuit shortly thereafter.  *See* Documents 29, 30 and 32 (State Street motion to vacate Gaia's dismissal and reply in support of that motion).  Gaia confirmed this tactic by filing a new lawsuit shortly thereafter, with motion to vacate still pending.  *See Gaia House Mezz LLC v. State Street Bank and Trust Company*, Civ. Action No. 11-Civ-5525(TPG).

Given the multiple proceedings, State Street requested a first status conference, which the Court held on September 9, 2011.  And, before that conference, State Street, in a cooperative effort not to waste time and resources on unnecessary proceedings responded to a threat by Gaia that it would file yet another preliminary injunction proceeding -- this one to hold the Project Fund Account escrow amounts in full -- by proposing and agreeing to hold that amount until the Court could resolve the legal entitlement to that account.  Gaia agreed to this without disclosing its intent to deplete that fund before the Court could address the issue on the merits.  Specifically, at the September 9 conference, without any advance notice, Gaia demanded the release of Project Fund Account funds, claiming dire need for them to pay contractors.  The facts later would reveal that Gaia concealed from the Court that Gaia had $7.76 million in Lien Law Trust Funds that Gaia and the Guarantors specifically admitted in formal governmental filings had to be used to pay contractors under the New York Lien Law.

At the September 9 conference, the Court ordered Gaia to file an amended complaint and for the parties to brief the lien law issues with letter briefs submitted to the Court on and after October 18, 2011.  The lien law issue Gaia raised is not only meritless, as explained in State Street's letter brief, but required substantial effort to address complex statutory provisions and applicable case law.

After Gaia filed its amended complaint, State Street again moved to dismiss the Accrued Interest claim under the clear contract terms and undisputed facts.  Extensive briefing from both

parties once again followed.  In it briefing, and at oral argument, Gaia largely ignored all the relevant and dispositive contract terms.  State Street's motion is still pending.  On November 16, 2011, the Court scheduled this case for an expedited trial on December 19, 2011.  Substantial trial preparations ensued and continue.

In sum, this litigation has involved multiple and extensive briefing, legal and factual research, and hearings, all prompted by Gaia's litigation tactics.  Gaia's actions have required that State Street's attorneys spend many hours on this matter.  The record in this case, including all the filings as reflected in the docket sheets for both lawsuits Gaia filed, and the work involved in the Letter Briefs submitted to the Court but that do not appear on the docket, reveals that State Street's attorneys' fees were reasonable and necessary to respond to Gaia's tactics.

The rates charged by State Street's counsel are within the range found to be reasonable in this district.  Here, most litigation work has been performed by partner Andrew C. Phelan ($560/hour) and associates Evan J. Benanti ($464/hour) and Christopher L. Carter ($300/hour). These rates are reasonable; indeed, they are in line with or lower than rates that courts in this District have held to be reasonable.  *See, e.g., CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07 Civ. 11078, 2011 WL 4526132, *3 (S.D.N.Y. Sept. 29, 2011) (finding attorneys' fees of $632 per hour to be within the range of what courts have considered reasonable in the Southern District of New York); *In re Talik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y.2008) (finding $700 to $750 per hour rates are reasonable); *Silverblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 433 (S.D.N.Y.2007) ($675 per hour is reasonable rate); *In re AOL Time Warner Shareholder Deriv. Litig.*, No. 02 civ. 6302, 2010 WL 363113, *13 (S.D.N.Y.2010) (finding reasonable associate hourly rates ranging from $175 to $550 and partner hourly rates ranging from $300 to $850).

Moreover, Gaia's counsel's fees and hours also are relevant to the court's determination of reasonableness.  *See In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 587 (3d Cir. 1984) (fee opponent's record "certainly was relevant" to challenge to reasonableness of hours and rates charged by comparable lawyers in complex litigation); *Blowers v. Lawyers Cooperative*

*Publishing Co.*, 526 F.Supp. 1324, 1326-27 (W.D.N.Y. 1981) (ordering disclosure of fee opponent's time and costs). Gaia has incurred substantial fees for partners and associates from very large New York law firms, including partners and associates from Willkie Farr & Gallagher LLP, Herrick Feinstein LLP, and Schulte Roth & Zabel LLP. The Schulte firm was responsible for the litigation prior to September 2011. To date, Gaia has refused to produce such relevant records despite its clear relevance given Gaia's stated intent to challenge the reasonableness of State Street's Professional Fees.

## III.   CLEAR CONTRACT AND STATUTORY TERMS DEFEAT GAIA'S CLAIM OF ENTITLEMENT TO THE PROJECT FUND ACCOUNT

Gaia has no right to funds in the Project Fund Account ("PFA") for the six reasons identified below. The factual background and relevant contract terms are explained immediately below, followed by the legal grounds for rejecting Gaia's PFA claim.

### A.   Background

Prior to the Third Modification, Gaia had committed numerous defaults by vastly overspending the Project Budget, failing to meet construction deadlines, and failing to repay the Loan. Despite these defaults, Gaia refused to contribute more equity even though Gaia needed more money to complete construction. As a result, the Lenders agreed to designate a portion of proceeds from the sale of condo units to designated accounts for use in paying Project Costs. This was a departure from the original contract terms, which provided that all the proceeds from condo sales would go directly to pay off the loans and related expenses. With regard to the Senior Loan, some condo sales proceeds were deposited in the Condominium Unit Sales Escrow Account ("CUSEA"). The Senior Loan was paid off in August 2010, at which point the CUSEA terminated and the funds were released to State Street and deposited in the PFA. Second Modification at 10 (§6.5(e)) & 12 (§7.31).

The contract allowed State Street to use PFA funds to pay down State Street's Loan:

> ...Lender may resort for the payment of the Debt to any Collateral held by lender in such order and manner as Lender, in its sole and absolute discretion, may elect.

Loan Agreement at §11.3(f). Further, §6 of the Lockbox Agreement stated:

> Lender shall have the right, at its election and sole discretion, upon the occurrence of an Event of Default to apply the proceeds of the Project Fund Account to the amounts secured or evidenced by the Subordinate Loan Documents. Neither the Borrower nor Project Owner shall have rights to the Project Fund Account other than to request advances thereof. . . . . The Project Fund account shall be the sole property of lender . . . . Upon maturity of the Loan, the amount in the Project Fund Account shall be treated as Gross Income hereunder.

Second Amended And Restated Security Agreement And Lockbox Agreement §6 (May 19, 2010) ("Lockbox Agreement"). Similarly, §8 of the Lockbox Agreement stated:

> Lender may, but shall not be obligated to, apply at any time the balance then remaining in the Accounts [which include the PFA] against the indebtedness secured hereby in whatever order Lender [s]hall subjectively determine.

Lockbox Agreement §8; *accord id.* §9 (same).

The contract gave Gaia the right to draw on funds in the PFA to pay for Project Costs only if Gaia did not commit any Event of Default. The contract said:

> Prior to the occurrence of an Event of Default, Borrower may draw upon the Project Fund Account for Project Costs which are unfunded in the amounts and for the items set forth in the Project Budget . . . .

Second Modification at 12 (§7.31). Thus, the PFA funds were not dedicated to Project Costs and were not required to be used for that purpose if Gaia committed any defaults.

Gaia had no contract right to any proceeds from unit sales, whether sent to the PFA or directly to pay down the Loan. All sales proceeds were wired directly from the buyer to the Lenders' accounts. Lockbox Agreement §4. Once in the PFA, Gaia had no right to those funds other than to request advances. *Id.* §6. The PFA was "the sole property" of State Street. *Id.* The PFA was not held in trust for Gaia. *Id.* §8. The contract gave State Street a property right and security interest in the PFA specifically to protect its ability to recover all amounts due under the Loan Documents. Gaia's grant to State Street of those rights was unconditional:

A/74613130.6

> As additional security for the payment of the Subordinate Loan and the payment and performance by Borrower of all duties, responsibilities and obligations under the Subordinate Note and the other Subordinate Loan Documents, each of Borrower and Project Owner hereby unconditionally, irrevocably and continuously assigns, conveys, pledges, mortgages, transfers, delivers, deposits, sets over and confirms unto Lender, and hereby grants to Lender a security interest in, (i) all funds now or hereafter deposited into the Lockbox Account, the Project Fund Account, . . . and all other Accounts, (ii) the accounts into which such funds have been deposited . . . .

Lockbox Agreement §9.   Gaia expressly disclaimed any property interest in the PFA and acknowledged that it belonged to State Street:

> Neither the Borrower nor Project Owner shall have rights to the Project Fund Account other than to request advances thereof. . . .  The Project Fund Account shall be the sole property of Lender . . . .

*Id.* §5.   The contract explicitly authorizes State Street to hold the PFA until all amounts due under the Loan Agreements are paid, including Professional Fees that are part of the Debt.   In this regard, the contract could not be more clear:  §8 of the Lockbox Agreement states:

> . . . . Thirty (30) days following (a) the full payment of the Subordinate Loan <u>and all other amounts due under the Subordinate Loan Documents</u> . . . the balance of the Accounts then in Lender's possession shall be paid over to Borrower and/or Lender in accordance with the provisions of this Agreement and no other party shall have any right or claim thereto.

*Id.* §8 (emphasis added).   As noted above, Gaia committed several Events of Default that precluded Gaia from using PFA funds to pay for Project Costs.

### B.   Gaia Has No Right to the PFA Funds Because State Street Is Not A Trustee Under The Lien Law Statute

The purpose of the Lien Law is to ensure that those who have directly expended labor and materials to improve real property receive payment for their work.  *Canron Corp. v. City of New York*, 652 N.Y.S.2d 211, 215 (N.Y. 1996) (citations omitted).  The Lien Law creates trust funds out of certain construction payments or funds to assure payment of contractors, suppliers, and laborers.  *Caristo Constr. Corp. v. Diners Fin. Corp.*, 289 N.Y.S.2d 175, 178 (N.Y. 1968).

New York courts have long and repeatedly held that lenders and mortgagees are not statutory trustees subject to the Lien Law because the statute states that only owners and

contractors can be statutory trustees.  A seminal cases on this issue is *ALB Contracting Co. v. York-Jersey Mortgage Co.*, 401 N.Y.S.2d 934, 934 (N.Y. App. Div. 1978).  In *ALB Contracting*, the court noted that the Lien Law:

> clearly provides that assets received by an owner in the form of payments under [a] building loan mortgage are to be included in the trust fund but there is no provision that the mortgagee becomes a trustee.

*Id.*  The court recognized that the duties imposed by the Lien Law are onerous and that no provision of the Lien Law made lenders -- or anyone other than owners and contractors -- potential Lien Law trustees:

> The duties imposed on a statutory trustee under Article 3-A [the Lien Law] are extensive and burdensome and subject the trustee to extensive potential liability. A lender is not a statutory trustee because "No one other than an owner, contractor, or subcontractor is designated as a prospective trustee in Article 3-A (of the Lien Law)"
>
> In the absence of specific language imposing such burden on a mortgagee on an improvement contract, none should be inferred.  To the contrary, "an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded.  [citations omitted, emphasis added]

*ALB Contracting*, 401 N.Y.S.2d at 934-35.  In *ALB Contracting*, the court refused to find that a lender that had withheld or re-obtained funds that were otherwise due to an owner under a building improvement loan became a statutory trustee under the Lien Law.  *Id.*[10]  Here, State Street is a lender and so not a statutory trustee under the Lien Law, and the Lien Law, as in *Elm Ridge*, is inapposite to the PFA.

---

[10] *Accord Caledonia Lumber & Coal Co. v. Chili Heights Apartments*, 417 N.Y.S.2d 536, 536 (N.Y. App. Div. 1979) (a lender is not a statutory trustee under the Lien Law); *In re Elm Ridge Assocs.*, 234 F.3d 114, 124 (2d Cir. 2000) (a lender is not constrained by the NY Lien Law because a lender is not a statutory trustee); *Givoh Assocs. v. Am. Druggists Ins. Co.*, 562 F.Supp. 1346, 1350-51 (E.D.N.Y. 1983) (holding that undisbursed loan/mortgage funds held by HUD as lender are not trust funds because lenders are not statutory trustees); *Utica Sheet Metal Corp. v. J.E. Schecter Corp.*, 262 N.Y.S.2d 583, 587 (N.Y. Sup. Ct. 1965) (rejecting lien law claim against bank, stating, "[n]o one other than an owner, contractor or subcontractor is designated as a prospective trustee under Article 3-A" of the Lien Law).

A/74613130.6

**C.      Gaia Has No Right to the PFA Funds Because the PFA Does Not Hold Lien Law Trust Funds and Gaia's Events of Default Bar Gaia from Claiming Such Funds Until it Pays all Outstanding Debt Still Due**

Section 70(5)(a) of the Lien Law identifies as trust assets the financing an owner receives or has a right to receive under a building loan agreement.  Section 1.1 of the Loan Agreement defines the "Loan" here as the financing the Lender provided to Gaia to refinance then-existing indebtedness and pay certain demolition and construction expenses.  This definition does not cover revenues from the sale of condo units, which are called "Gross Revenues."  Loan Agreement at A-9.  The funds in the PFA are Gross Revenues, not Loan proceeds.  Accordingly, the PFA does not hold any funds that Gaia received or had a right to receive as "Loan" proceeds.

Gaia never had any right to receive condo sales proceeds that went into the PFA.  The contract required that proceeds from condo sales be wired directly from the buyer to Accounts controlled by State Street.  In those Accounts, those funds were defined as State Street's property, in which Gaia had no rights whatsoever except to request disbursements.  Lockbox Agreement §§ 4 & 6.  Further, the PFA contract terms state that, in order for Gaia to have any right to them for Project Costs, Gaia first had to satisfy the condition precedent by not committing any defaults.

Gaia can only claim a right to PFA funds by ignoring the clear condition precedent in the contract that said: "Prior to the occurrence of an Event of Default, Borrower may draw upon the Project Fund Account for Project Costs which are unfunded in the amounts and for the items set forth in the Project Budget".  Second Modification at 12 (§7.31) (emphasis added).  Gaia cannot conveniently read out of the contract this bargained-for condition precedent.  By its multiple Events of Default, Gaia failed to earn any right to use PFA funds for Project Costs.  Accordingly, the PFA funds are not trust assets nor assets that Gaia has any contractual right to claim unless and until Gaia pays all amounts due under the Loan Documents, under §8 of the Lockbox Agreement.  *See Pecker Iron Works, Inc. v. New York Trades Council Ass'n of N.Y.C. Health Ctr. Inc.*, 802 N.Y.S.2d 399, 399 (N.Y. App. Div. 2005) (retainage funds were not trust funds belonging to contractor because contractor defaulted on contractual obligations and so failed to

earn any right to the funds).[11]

**D.    Even if They were Trust Funds, Gaia Has No Right to the PFA Funds Because State Street's Use of Them to Pay the Debt is a Proper Use under the NY Lien Law.**

Even if the PFA held trust funds, Gaia would have to use them to pay sums owed to State Street because such use is a proper "cost of improvement" under the Lien Law.  Section 71(1) of the Lien Law requires an owner to use trust assets under §70(5)(a)-(f) to pay the "cost of improvement."  Section 2(5) of the Lien Law defines "cost of improvement" to include "sums paid to discharge or reduce the indebtedness under mortgages and accrued interest thereon . . . sums paid to discharge building loan mortgages . . . and interest on building loan mortgages".  Here, that is the express purpose for which State Street would use the PFA funds:

> Lender shall have the right, at its election and sole discretion, upon the occurrence of [an] Event of Default to apply the proceeds of the Project Fund Account to amounts secured or evidenced by the Subordinate Loan Documents.

Lockbox Agreement §5; *accord id.* §§ 8 & 9.

**E.    Gaia Has $7.76 Million In Lien Law Trust Funds To Pay Contractors Without Violating State Street's Security Interest In and Depleting the PFA**

As already demonstrated in State Street's October 18, 2011 Letter Brief and the Deeds attached thereto that Gaia filed with the New York Register, Gaia has $7.76 million in NY Lien Law trust funds that it must use to pay contractors.  In this litigation, and without disclosing its possession of these $7.76 million in Trust Funds, Gaia has repeatedly sought to give the impression that it was desperate for funds to pay contractors to prevent them from liening the property.  All this was an illusion created by Gaia's failure to disclose that it had $7.76 million in trust assets designated for this very purpose.  This fact is demonstrated by the official Deeds Gaia filed with the New York government and Gaia's own representations to the Court on November 16, when, in response to questioning from the Court, Gaia explained that it purported

---

[11] The contract defines Project Costs as the costs incurred "through the Scheduled Maturity Date" on July 15, 2011.  Loan Agreement at A-18.  Thus, by definition, any costs incurred _after_ July 15 would not be "Project Costs" payable with PFA funds even if Gaia had fulfilled the condition precedent.

to "sell" the three remaining units for $16.76 million in July 2011, but cannot properly account for the balance of $7.76 million in NY Lien Law Trust Funds resulting from that sale after Gaia paid the $9 million owed to State Street.  Indeed, Gaia stated that the "sale" apparently was not one at arms length in which the $16.76 million purchase price was exchanged between Gaia and the buyers.  The "buyers" were affiliated Gaia entities -- including the Gaia principals and Guarantors.  This "sale," while purportedly for $16.76 million, involved the exchange of only about $8 million in cash with the rest in some form of equity distribution by Gaia to its principals and Guarantors.  Such distribution is an improper use of Trust Funds under the NY Lien Law -- and by Gaia's own admission in the three Deeds Gaia filed with the NY Register.  It is an improper diversion because Gaia has admitted that Gaia still owes money to contractors and suppliers for work on the project.  Any such contractors and suppliers have an action against Gaia to recover those assets due to Gaia's unlawful diversion.

Gaia's claim here to the PFA reduces to efforts to ignore clear contract terms, conceal its own diversion of $7.76 million in Trust Funds, and render meaningless State Street's bargained-for and unambiguous security interest in the PFA.  By doing so, Gaia apparently intends to make it far more difficult and expensive for State Street to pursue Gaia and the Guarantors to collect the Debt they owe.  Clear contract terms and the provisions of the NY Lien Law reveal Gaia's improper efforts.[12]

### F. Gaia Lacks Standing To Sue As To The PFA Funds Because Gaia is not a Trust Beneficiary and has Failed to Sue for any Beneficiaries in a Representative Capacity as Required by the NY Lien Law

Gaia's Lien Law claim fails for an additional significant reason.  Because the Lien Law

---

[12] If Gaia already distributed the trust assets to its principals, then Gaia has violated the deed covenants quoted above and §70(3) of the Lien Law, which prohibits Gaia from diverting any trust funds before all contractors have been paid in full.  Any diversion by Gaia to its members would be both a civil and criminal violation.  *See Pinnacle Envtl. Sys. Inc. v. R.W. Granger & Sons Inc.,* 665 N.Y.S.2d 473, 475 (N.Y. App. Div. 1997) ("unauthorized disbursement of trust assets, without satisfying the claims of contractors or subcontractors, constitutes larceny punishable" under criminal law).  Further, the Loan Agreement also barred Gaia from making any equity Distribution to its principals before all Debt to State Street was repaid.  Loan Agreement §10.2 & A-6.

26

protects suppliers of labor and material, an action under the Lien Law must be brought in a representative capacity by one who holds a trust claim on behalf of all lien holders. Lien Law §77(1). Gaia, however, is an owner and so cannot be a holder of a trust claim. Here, Gaia sued in its own name and failed to bring suit in a representative capacity in clear violation of §77(1) of the Lien Law. Further, as just demonstrated in the prior section immediately above, Gaia cannot properly serve in a representative capacity to pursue the interests of any trust beneficiaries here given Gaia's own apparent diversion of $7.76 million in Trust Funds for its own uses.

## IV.   <u>RELIEF REQUESTED BY STATE STREET</u>

For the reasons stated above, in State Street's filings to date, and the evidence and argument presented at and after trial, State Street seeks the following relief:

a. entry of judgment that State Street is entitled to Accrued Interest in the full amount collected;

b. entry of judgment that Gaia and each Guarantor are individually, jointly, and severally liable for Professional Fees in the amount to be proven at trial, and for the amounts incurred during and after the trial in an amount to be determined by the Court;

c. entry of judgment that State Street can use the funds in the PFA to pay Professional Fees owed by Gaia and each Guarantor;

d. denial of all of Gaia's and the Guarantors claims and defenses; and

e. such other relief as the Court determines to be just and proper.

Dated: December 5, 2011

**STATE STREET BANK AND TRUST COMPANY**

*By its attorneys*

Andrew C. Phelan (*admitted pro hac vice*)
Evan J. Benanti (EB1202)
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 951-8000
Fax: (617) 951-8736

A/74613130.6