UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------x
                                         :

GAIA HOUSE MEZZ, LLC, et al.       :

                                           :

                   Plaintiffs,     :      11 Civ. 3186 (TPG)

                                           :

            – against –         :      **OPINION**

                                         :

STATE STREET BANK AND TRUST     :
COMPANY,

                                         :

               Defendants.     :
----------------------------------------------x
                                         :

STATE STREET BANK AND TRUST     :
COMPANY,

                                         :

          Counterclaim Plaintiff,  :

                                         :

            – against –         :

                                         :

GAIA HOUSE MEZZ LLC, et al.      :

                                         :

          Counterclaim Defendants.  :

----------------------------------------------x

      This is a dispute regarding a loan to build a luxury condominium in the West Chelsea neighborhood of Manhattan.  In early 2011 when the building was nearly finished and almost all of State Street's loan had been paid off, the parties had a dispute regarding approximately $4.5 million dollars of interest, which State Street had agreed to waive at one point, but subsequently refused to waive.  Gaia House ultimately paid State Street this sum under protest, and now seeks its return.  Gaia House also seeks up to $370,000 of attorneys' fees that it paid State

Street under protest and a declaration that it is entitled to a fund of approximately $700,000, which it is currently holding subject to the court's decision.  Three of Gaia House's affiliates seek approximately $328,000 of increased financing costs they incurred as a result of the dispute with State Street.  The court held a bench trial on December 19-21, 2011, January 4-6, 2012, and January 12, 2012.  The court reserved decision at the conclusion of the trial.

The following opinion sets forth the court's findings of fact and conclusions of law.

## INTRODUCTION

The detailed facts are intricate and need to be set out at length. However, the court believes that it would be helpful to present, by way of this Introduction, a summary of the evidence about how the transactions between the parties concluded.  The court realizes that it is unusual to start with the ending, but the reasons for doing so will appear.

The main issue in this case is whether State Street is entitled to retain $4.5 million in interest, which Gaia House paid under protest when it paid off a construction loan.

During the course of the two-year relationship between Gaia House and State Street, it was agreed that Gaia House, which had become obligated to pay a very substantial amount of interest on the loan, would not be required to pay further interest, so long as certain conditions were met.  This was what has been referred to as the "Accrued Interest

Waiver."  One of these conditions was that no "Event of Default" would occur prior to the maturity date of the loan.

As the detailed factual description will show, the Accrued Interest Waiver was considered by all parties to be a strong inducement for the principals of Gaia House to continue with the construction of the building and the sale of apartments under very difficult economic conditions.  The Accrued Interest Waiver was of substantial value, amounting to about $4.5 million at the time the State Street loan was paid off.

However, the time came when State Street notified Gaia House that it would not honor the Accrued Interest Waiver and that, in paying off the final balance of the State Street loan, which had been paid down from about $30 million to $4.1 million, it would need to double that payment by paying the additional Accrued Interest of $4.5 million.  This notification came in a letter from State Street to Gaia House dated March 24, 2011.  The letter stated quite explicitly why the Accrued Interest Waiver was being voided.  The letter specified, "As Lender has previously advised you, two Events of Default have occurred and are continuing . . . ."  Although the letter did not expressly describe what these two Events of Default were, the reference was to the failure to obtain the Temporary Certificate of Occupancy for Penthouse 2 by July 15, 2010, and the failure to attain "Substantial Completion" by July 15, 2010. Despite what the letter says, these alleged Events of Default were not

continuing as of March 24, 2011.  But it is true that under a certain modification to the loan arrangements, Gaia House was supposed to obtain the Certificate of Occupancy for Penthouse 2 by July 15, 2010, and was to attain Substantial Completion by July 15, 2010.  This July 15, 2010 date had not been met as to the Penthouse 2 Certificate of Occupancy, and had arguably not been met as to Substantial Completion.  Thus, State Street could reasonably take the position that two Events of Default had occurred as of July 15, 2010.

A bizarre circumstance arose at the trial of this action.  Robert Emslie, who supervised the Gaia House transaction for State Street and who was State Street's main witness at the trial, testified about why State Street decided not to honor the Accrued Interest Waiver.  He presented an entirely different version from what had been stated in the March 24, 2011 letter.  He testified that State Street objected to certain actions by Gaia House, as to which the March 24 letter had expressly stated that State Street "has no objection."  He stated that the reason for not honoring the Accrued Interest Waiver was that affiliates of Gaia House had purchased the remaining three apartments, and that this deprived State Street of its opportunity to turn a profit on the basis of a provision in the lending arrangements allowing for a possible 50/50 sharing of part of the proceeds of apartment sales.  Later in this opinion there will be a description of the provisions in the loan arrangements dealing with this 50/50 sharing, as well as a description of the provision

dealing with the possible purchase of apartments by Gaia affiliates.  The point to be made in this Introduction is simply to show the difference between the position State Street took in its notice of March 24, as to the reason for voiding the Accrued Interest Waiver, and the position State Street took in trial testimony.  This difference has an important bearing on the factual and legal issues to be decided by the court.

The crucial trial testimony came from Emslie in answer to a question of the court:

> THE COURT:  Now, is it your testimony, as far as your intention and your purpose, that if Gaia had stayed with the idea of selling to third parties and having the waterfall procedure go forward, you would not have decided to charge the accrued interest, is that what you're saying?
>
> THE WITNESS:  Yes, sir.

The "waterfall procedure" refers to the 50/50 sharing.  This testimony has only one possible meaning.  It means that State Street was prepared to disregard or waive the eight-month old Events of Default that had accrued on July 15, 2010 and had been cured.  According to the Emslie testimony, State Street's decision to void the Accrued Interest Waiver had nothing to do with those Events of Default, but had to do with something entirely different:  being deprived of a possible profit under the 50/50 sharing arrangement.

The court will of course make its ruling later in this opinion about whether State Street is or is not legally entitled to the $4.5 million in

Accrued Interest.  However, the court has the following comments in this Introduction, based on the circumstances just described.

The decision to void the Accrued Interest Waiver was a weighty one.  It was anything but a routine bookkeeping matter.  Nor was it something automatically arising from the two Events of Default which accrued on July 15, 2010.  The notice of March 24, 2011 occurred eight months after this July 15, 2010 date and the actual charge of the Accrued Interest would occur about a year after.  During the months and the year following July 15, 2010, Gaia House carried out in an exemplary fashion its responsibilities for completing the building and marketing of apartments.  This was sufficient to completely pay off the senior loan of $45 million and, as has been described, to pay down the State Street debt to $4.1 million.  As Emslie in effect admitted at trial, this was grounds for disregarding the two long-ago Events of Default of July 15, 2010, in connection with the Accrued Interest Waiver.  State Street's decision, in the face of these circumstances, to void the waiver was a decision of substantial consequence, to say the least.

The court believes that State Street has not been candid with the court in explaining this decision.  The purported reason given in the March 24, 2011 notice was essentially repudiated in the trial testimony.  As to the trial testimony, the court believes that it cannot be credited in material respects.  The court wishes to say that Emslie's testimony was not merely his personal version.  Undoubtedly what was presented was

the position of State Street (meaning Emslie and colleagues).  State Street's house counsel attended the trial throughout.

The court testimony was that State Street took the $4.5 million Accrued Interest because it was deprived of a valuable opportunity under the 50/50 sharing provision.  The court does not credit this.  The people at State Street surely took their pencils and made calculations, and for reasons which will be explained later in this opinion, it was clear beyond any question that the most which could be expected from the 50/50 sharing was about $1 million, and that whether and when even this amount could be realized was a matter of speculation.

The one thing that is clear is that State Street decided to earn an additional $4.5 million.  The justification for doing so is something about which State Street has made contradictory and unconvincing assertions.  No credible and satisfactory justification has been shown.  The fact is that, beginning in September 2009, when the Accrued Interest Waiver provision was inserted into the Loan Agreement, and continuously thereafter, to the end of the project (including, most importantly, before and after July 15, 2010), Gaia House did exactly what State Street intended to induce it to do – finish the project and sell apartments so that the senior loan and the State Street loan would be paid off.  In the last phase, Gaia House exercised the Affiliate Purchase Rights for the remaining three apartments to carry out the exact purpose for which the

Affiliate Purchase Rights were provided – to raise money to complete the payment of the State Street loan.

Gaia House earned the Accrued Interest.  State Street's conduct during the transaction and its testimony at the trial confirmed this.

## FACTS

The Parties

Plaintiff Gaia House is a company formed to build a luxury condominium in the West Chelsea neighborhood of Manhattan, at 200 Eleventh Avenue.  Its principals are Glauco Lolli-Ghetti, Young Woo, and Margarette Lee, who are also counterclaim defendants in this action. Lolli-Ghetti, Woo, and Lee are experienced real estate developers.

Plaintiffs West Sky, LLC; 200 11th 11S LLC; and 24th Street Capital Group LLC are affiliates of Gaia House who were created by Gaia House in order to exercise Gaia House's "Affiliate Purchase Right," which will be discussed in detail later in this opinion.  Lolli-Ghetti appeared as a witness for Gaia House at the trial.

State Street Bank and Trust Company is the bank that, until recently, held a "mezzanine" loan in connection with the Gaia House project.[1]  Robert Emslie, a Vice President of State Street, testified on State Street's behalf at the trial.

_____

[1] A mezzanine loan is a junior loan that is secured not by real property, but by ownership interests of the company taking out the loan.  In this case, the loan was secured by a pledge of the membership interests of plaintiff Gaia House Mezz LLC, a limited liability company.  For purposes of this opinion, membership interests in a limited liability company can

Background of the Dispute

The condominium apartments in Gaia House range in price between $5 million and around $12 million.  The building contains 16 units and is approximately 50,000 square feet.  One distinctive feature is that Gaia House has a "sky garage."  This sky garage allows the residents to take their cars up to a garage on their floor.[2]

In order to build their luxury condominium building, Gaia House incurred over $65 million in debt.  $45 million of this financing was borrowed from iStar, the senior lender who held a mortgage on the land where Gaia House was building.  As will be described below, iStar has now been fully repaid and is not involved in this litigation.

The second piece of financing for this project is what is at issue in this litigation.  Lehman Brothers loaned Gaia House $11.8 million pursuant to a Mezzanine Loan Agreement.  This is the Loan Agreement which will be referred to frequently in this opinion.  In a modification, Lehman Brothers increased that amount to $20.7 million.  The initial interest rate on the loan was over 20%, compounded monthly.  As noted above, the loan was secured by a security interest in the membership

---

be thought of as akin to stock in a corporation or partnership interests in a partnership.

[2] A virtual tour of this sky garage is available at http://www.200eleventh.com (last visited April 30, 2012).  A description of this sky garage concept also appears in a recent New York Times article.  See Ken Belson, Even on the Eleventh Floor, There's Parking Right out Front, NEW YORK TIMES, December 2, 2011, available at http://www.nytimes.com/2011/12/04/automobiles/even-on-the-11th-floor-theres-parking-right-out-front.html.

interests of Gaia House.  Lee, Lolli-Ghetti, and Woo also executed a Completion Guaranty, in which they guaranteed the full and prompt payment and performance of Gaia House's obligations under the loan agreement.  Gaia House initially invested $6.5 million of its own money in this project.  Over time that figure has increased to $13.4 million.

State Street came to be the lender under the Loan Agreement after Lehman Brothers went bankrupt.  State Street had loaned Lehman Brothers $1 billion secured by rights in a number of commercial loans, including the loan to Gaia House.  State Street acquired these loans after Lehman Brothers' collapsed.  Robert Emslie, a Vice President of State Street, was assigned to manage the repayment of the Gaia House loan.

The Second Modification

During the economic downtown in 2008 and 2009, Gaia House had serious difficulty making progress on the condominium project.  Certain contractors and subcontractors were in trouble.  Some went out of business altogether and a number of them defaulted on their agreements with Gaia House.  As a result, Gaia House suffered delays and cost overruns, and was unable to meet the initial July 1, 2009 maturity date for the loan held by State Street.

Meanwhile, the interest due on Gaia House's loan with State Street ballooned to $10.1 million dollars, owed on a $20.7 million loan, due to the high compound interest rate.

As of mid-2009, the Gaia House condominium project looked as if it might not be completed.  Lolli-Ghetti informed Emslie that Gaia House was considering giving up on the project.  These conditions were the impetus for a Second Modification to the Loan Agreement, which Gaia House and State Street entered on September 23, 2009.[3]

A number of provisions of the Second Modification are at issue in this litigation.  The central such provision is the "Accrued Interest Waiver" term, which first appeared in the Second Modification.  This provides:

> On the Maturity Date, the entire Debt, if not sooner paid, shall become due and payable in full.  Notwithstanding the foregoing, if the entire Debt, other than . . . [Accrued Interest], is paid in full on the Scheduled Maturity Date and no Event of Default occurs prior to such Scheduled Maturity Date, lender shall waive the payment of Accrued Interest from Borrower.

As described above, over $10 million of interest had already accrued on the $20.7 million loan.  While the Accrued Interest Waiver did not excuse Gaia House of the obligation to pay interest that had already accrued, State Street agreed to waive interest that accrued after the Second Modification.  This provision, which froze the interest, was crucial to Gaia House's decision to continue with the project.

TriMont Real Estate Advisors, a company which performed certain services for State Street, sent Gaia House monthly statements regarding the loan.  Before the Second Modification, TriMont's monthly

---

[3] Whatever the First Modification was, it is not relevant to the present action.

statements showed that the interest attributable to that month was being

added to the principal of the loan each month to show the total balance

then due.  This addition was occurring under a line called

"TRANSACTIONS" on the monthly statement.  After the Second

Modification, the amount due did not include newly Accrued Interest and

the Accrued Interest began to be tracked on a line called

"UNCAPITALIZED DEFERRED INTEREST BALANCE."

Another important contractual provision that was introduced in

the Second Modification is the "Affiliate Purchase Right."  This provides:

> Notwithstanding any contrary provisions in this Agreement
> or the Loan Documents (including, without limitation, the
> terms of Section 7.27(a)(iv) of the Loan Agreement), Borrower
> or an Affiliate of Borrower shall be allowed to purchase any
> of Residential Units 5S, 7S, 8N, 9S, 11S, PH1, and PH2 in
> order to satisfy the Loan and Senior Loan reduction
> covenants described above at the applicable "Minimum Unit
> Sales Price," provided that neither Borrower nor such
> Affiliate shall be permitted to market, or resell any such
> Residential Unit or Units until the repayment in full of the
> Loan unless, in connection with the closing of any such
> resale the Loan would be paid off.

The applicable Minimum Unit Sales Prices ("MUSP") are set forth in the

contract documents.  The idea was that these prices might well turn out

to be less than fair market value.  This provision was repeated in the

Third Modification, which will be discussed below, except that some

units were no longer included in that iteration of the Affiliate Purchase

Right because they had already been sold to third parties.

The purpose of this provision was to allow Gaia House to purchase

the units, or cause its affiliates to do so, in order to provide cash and

ensure that Gaia House satisfied applicable loan reduction covenants. This would avoid a default and prevent State Street from exercising its security interest in Gaia House's membership interests.

 As part of the Second Modification, the parties also amended what is known as the "Lockbox Agreement." The Lockbox Agreement is an agreement that, among other things, provides a mechanism for the distribution of proceeds from the sales of condominiums in the Gaia House project, sometimes referred to as the "waterfall." The Lockbox Agreement provides that proceeds of sales of units were to be put in the Lockbox Account and disbursements were to be made out of that account in the following order of priority:

 (1) to Lender, for any unpaid reimbursable costs and expenses or in the enforcement of Lender's rights under the loan documents;

 (2) to Lender, for reduction of the outstanding loan balance;

 (3) to Lender, for repayment of any other amounts due and owing to Lender pursuant to the terms of the Loan Documents;

 (4) to Borrower, for repayment to Borrower of its equity balance in the project;

 (5) the balance shall be split and paid 50% to Borrower and 50% to Lender until all of the Units have been sold.

Prior to the Second Loan Modification, the order of priority had always been that State Street would be paid first and then Gaia House would be repaid for its equity investment in the Project, in accordance with steps 1-4 listed above. Gaia House would then keep any profits after recouping its equity. The Second Modification added the fifth step,

which gave State Street a right to share profits with Gaia House after Gaia House's equity was repaid. Emslie testified that he would not have been able to commit State Street to the Accrued Interest Waiver, which was previously discussed, if not for the possibility of State Street sharing 50/50 in the proceeds of unit sales under step 5 of the waterfall.

The Second Loan Modification also gave Gaia House four "Extension Options" to extend the maturity date of the loan for another six months so that Gaia House could avoid a default. These extension options allowed for extensions between the following periods: July 2, 2009 until January 15, 2010; January 16, 2010 until July 15, 2010; July 16, 2010 until January 15, 2011; and January 16, 2011 until July 15, 2011. These extension options were subject to various conditions. One condition that is relevant to this litigation was that no

> Event of Default or Unmatured Event of Default shall have occurred and be continuing at the time the applicable Extension Option is exercised and on the date that the applicable Extension Period is commenced or becomes effective.

The Second Loan Modification also set forth various deadlines for Gaia House to meet certain obligations under the Loan Agreement. Certain "Temporary Certificates of Occupancy" ("TCOs") needed to be obtained before a condominium can be sold. These dates were January 15, 2010, March 1, 2010, or April 15, 2010, depending on the unit. It also provided that "Substantial Completion" was to be attained by June 30, 2010.

The Second Modification also created a "Project Fund Account" ("PFA"). The PFA was an escrow account that included the proceeds of sales of units, which was designed to "fund the Project Costs which are set forth in the Project Budget . . . to complete the Project." Project Costs include "all costs and expenses of any kind . . . required or incurred in connection with the . . . Construction and Use of the Project." Pursuant to the terms of the parties' Lockbox Agreement, prior to the occurrence of an Event of Default, Gaia House would submit verified "draw" requests so that it could draw on these funds to pay the costs of construction. However, the loan arrangements required State Street to return any funds in this account to Gaia House within thirty days of Gaia House's full repayment of State Street's loan.

The Third Modification

By May 19, 2010, Gaia House and State Street entered into yet another modification to the Loan Agreement. This Third Modification was spurred by Gaia House's further difficulties in completing the project. It had missed a "Senior Loan reduction covenant" and had failed to timely obtain certain TCOs. There had also been cost overruns on the project. At this time, iStar, the senior lender, was still owed $7 million of the original $45 million that Gaia House borrowed from it. None of the State Street loan had been paid. Gaia House had exercised the first two extension options and in just under two months Gaia House would have to either exercise the third option, or face a default.

The Third Modification repeated the Accrued Interest Waiver, 50/50 profit sharing, and Affiliate Purchase Right provisions.  In this iteration of the Affiliate Purchase Right, the contract allowed for the purchase of units 5S, 8N, 11S, PH1, and PH2, which were the unsold apartments as of this time.  The Third Modification also extended the deadline for obtaining the final remaining TCOs to July 15, 2010, and extended the deadline for attaining Substantial Completion to July 15, 2010.

Failure to obtain the TCOs by July 15, 2010, and failure to attain Substantial Completion would be Events of Default within the meaning of the provision regarding the Accrued Interest Waiver.

It is appropriate at this point to have some discussion of the concept of "Substantial Completion."  Section 5.2(j) of the Loan Agreement contained a highly detailed definition, requiring that there be certificates that the entire project other than punchlist items had been completed; that there be an "as built survey of the Project showing no encroachments;" that there be final lien waivers from all contractors; that there be a final "comprehensive endorsement" of the title policies; and so forth.

There is no evidence that this list was ever given the slightest consideration by the parties during the project.

Indeed, State Street defined and applied Substantial Completion in an entirely flexible manner in order to benefit itself at a particular juncture.

For instance, State Street wished to have the senior lender, iStar, make its final advance under its loan.  This would help further the project so that State Street would start being paid.

Under the terms of the Loan Agreement, such a "final advance was made when the Project was Substantially Complete and nearing final completion, as demonstrated by satisfaction of the requirements listed in § 5.2(j) of the Loan Agreement."  (Declaration of Robert A. Emslie, September 21, 2011.).  The fact is that this final advance by iStar was made on June 24, 2010.  This occurred despite the fact that what was listed in § 5.2(j) had <u>not</u> in fact been accomplished.  Emslie's declaration is at the very least mystifying as being entirely contrary to the known facts.  However, State Street was willing to agree that Substantial Completion, as more loosely defined to suit its purposes, had occurred and the final iStar advance was made.

To return to the Third Modification, following that modification, work continued and July 15, 2010 arrived when certain things were required to be accomplished.  The TCO for one of the apartments, Penthouse 2, had not been obtained.  And, despite what has been described about agreeing to Substantial Completion to obtain the final

iStar advance on June 24, 2010, State Street contends in this litigation that Substantial Completion had not been attained by July 15, 2010.

State Street takes the position in this litigation that these were Events of Default, within the meaning of the Loan Agreement provision about Accrued Interest Waiver and that the occurrence of these Events of Default meant, under that provision, that the Accrued Interest Waiver was null and void as of July 15, 2010, with no ability to cure.

If this is the case, on July 15, 2010, the liability of Gaia House for interest on the State Street loan increased by an amount that would be over $4.5 million when the loan was finally paid. Such a thing would represent a drastic change for Gaia House and would make a substantial amount of additional money for State Street. One would have thought that State Street might at least send a post card to Gaia House with the news.

But nothing happened. There is no evidence of any letter, email, meeting, telephone call, or any kind of conversation about what occurred or failed to occur on July 15, 2010.

It is surely reasonable to conclude that State Street knew what was happening. But it is equally reasonable to conclude that State Street intended that there be no notice taken of the alleged Events of Default of July 15, 2010. State Street's objective was to keep Gaia House working—to keep Gaia House striving—in order that the project would be completed and in order that the $30 million owed to State Street would

be paid. State Street knew full well that the Accrued Interest was a
strong incentive for Gaia House to do what State Street wished to be
done and State Street did not wish to disturb this incentive.

It is of interest to note that there came a time when State Street
did give Gaia House notice that the various detailed requirements in this
definition of Substantial Completion had not been met.  This occurred in
a letter dated April 13, 2011.  It stated that none of the certificates or
other documents, the furnishing of which would constitute Substantial
Completion, had been furnished by July 15, 2010.  Why the nine-month
wait?  The record demonstrates that the formal "paper" requirements for
Substantial Completion were given little or no regard by either Gaia
House or State Street, since they were clearly concerned with what was
taking place on the ground.  Also, as already indicated, State Street did
not wish to do or say anything which might disturb Gaia House's reliance
on the Accrued Interest Waiver.

After July 15, 2010, Gaia House continued to make progress.  On
August 2, 2010, Gaia House sold Unit 4N-S for $8.1 million and used
that money to pay off iStar in full.  Gaia House then sold two more units
and by October 2010, it had reduced the amount due under State
Street's loan from over $30 million to $21.8 million.

On August 2, 2010, the day that Gaia House closed on the sale of
Unit 4N-S and finished paying off iStar, Emslie congratulated
Lolli-Ghetti, saying, "Great news."  On October 22, 2010, Lolli-Ghetti

received an email from a representative of Jones Lang Lasalle ("JLL"), State Street's real estate consultant, saying, "Congrats on another closing."

After the July 15, 2010 date, the Trimont monthly statements continued showing the amount due to State Street, calculated without Accrued Interest being added.  On July 30, 2010, a representative of Trimont, emailed Lolli-Ghetti the August Trimont statement, saying "the statement shows the $30MM balance but interest is accruing on the $22MM."  Lolli-Ghetti responded, asking "would like to confirm thought that the interest accruing would only come due in the event of borrower's default."  The Trimont representative responded, "That is correct."  These emails confirmed that the statements given to Gaia House were not adding Accrued Interest to the amount due.  Indeed, Trimont did not mention any Event of Default as having already occurred.

Representative of State Street were in regular contact with Gaia House at the site of the project in New York City.  In addition, Emslie, and perhaps others from State Street, held biweekly conference calls with Gaia House from Boston. All this was designed to make sure that Gaia House continued the work and the sales efforts which would ensure that State Street's $30 million of debt would be paid off.  No mention was made of any problem about the Accrued Interest.  State Street obviously wished to have that incentive in place to activate Gaia House.

As the end of 2010 approached, State Street had certain concerns. The amount of $21.8 million was still due to State Street out of the indebtedness of $30 million.  This balance would be due in the middle of January 2011, unless Gaia House requested, and State Street consented to, the Fourth Extension option, which was the last such extension available under the contract.  If this extension became effective, the final date for paying the State Street loan would be July 15, 2011.

On December 2, 2010, Emslie sent Gaia House a letter declaring that three Events of Default had occurred.  The first pertained to what State Street called a "Deficiency" of $172,698.21.  The precise meaning of this Deficiency is not clear, and will not be discussed further in this opinion because the point was dropped by State Street in the course of further correspondence.  The other Events of Default referred to in the letter were Gaia House's failure to obtain the TCO for PH2 by July 15, 2010 and Gaia House's alleged failure to achieve Substantial Completion by July 15, 2010.

The letter went on to discuss the possible Fourth Extension option:

In order for the Borrower to be able to exercise the Fourth Extension Option and extend the Maturity Date to the Fourth Extended Maturity Date of July 15, 2011, pursuant to Section 1.2(b) of the Loan Agreement, several conditions precedent must be satisfied.  One of those conditions precedent is that no Event of Default or Unmatured Default shall have occurred and be continuing at the time the Fourth Extension Option is exercised nor on the date that the Fourth Extension Period is commenced or becomes effective. Therefore, if Borrower fails to cure the Specified Defaults, Borrower shall have no right to exercise the Fourth Extension Option.

Emslie testified about this language in a curious manner.  Emslie
testified that the language was in error and he gave his "corrections," as
follows:

> In order for the Borrower to be able to exercise the Fourth
> Extension Option and extend the Maturity Date to the
> Fourth Extended Maturity Date of July 15, 2011, pursuant
> to Section 1.2(b) of the Loan Agreement, several conditions
> precedent must be satisfied.  One of those conditions
> precedent is that no Event of Default or Unmatured Default
> shall have occurred ~~and be continuing~~ at the time the Fourth
> Extension Option is exercised nor on the date that the
> Fourth Extension Period is commenced or becomes effective.
> Therefore, if Borrower fails to cure the ~~Specified~~ [adding the
> word "Deficiency"] Default~~s~~, Borrower shall have no right to
> exercise the Fourth Extension Option.

In other words, he testified that the phrase "and be continuing" was put

in the letter erroneously, and that the concept of "cure" could only be

applied to the alleged Deficiency Default.  He was thus tailoring the letter

to fit the litigation position of State Street, to the effect that, once the

Events of Default of July 15, 2010 had occurred, the consequences set in

immediately to nullify the Accrued Interest Waiver.  However, Emslie

ultimately admitted under the court's questioning that there was no

mistake whatever in the language in question, and that he had written

the letter correctly, based upon the requirements for exercising the

Fourth Extension Option, as laid out in § 1.2(b) of the Loan Agreement.

On December 7, 2010, Gaia House responded to Emslie's letter,

disputing the allegations that Gaia House had committed Events of

Default and formally exercising the Fourth Extension Option.

On December 13, 2010, the New York City Department of
Buildings issued the TCO for PH2.  Indeed, PH2 had been successfully
inspected near the end of November, and State Street had been notified
of this.

Within the next week, Gaia House located a buyer for PH2 and on
December 23, 2010, Gaia House closed on the sale of PH2 for just under
$12.8 million.  All of the proceeds of this sale went to paying down State
Street's loan.  After this sale, which Gaia House refers to as the
"Christmas Miracle," the amount due on the State Street loan was
$9,075,153.

By letter dated January 7, 2011, State Street allowed Gaia House
to exercise the Fourth Extension.  As already stated, this extended the
date (being the final date) for the repayment of the State Street loan to
July 15, 2011.  In the January 7 letter, State Street said that it would
allow the Exercise of the Fourth Extension option "in furtherance of
advancing our continued mutually beneficial business relationship."
State Street also informed Gaia House that despite Gaia House's
obtaining of the PH2 TCO and sale of PH2, State Street still considered
that Event of Default to have occurred, and still considered the
Substantial Completion default to be continuing.

As earlier described, under the Loan Agreement, the Fourth
Extension could not be exercised or granted if an Event of Default had
occurred and was continuing.  State Street granted the Fourth Extension

while stating that the Substantial Completion Default was continuing.

Thus State Street was disregarding the relevant contractual provision.  It

should further be noted that there was no attempt to analyze the detailed

definition of Substantial Completion, which definition was, as usual,

ignored.  What all this illustrates is that State Street made use of

contractual provisions to the extent that it wished to do so.  And State

Street's wish and objective was to have Gaia House pay the remaining

balance on the $30 million of debt, and the Fourth Extension was

necessary to give Gaia House the opportunity to do so.  If enforcement or

application of detailed contractual rights interfered with this prime

objective, they went by the board.

　　　　To return to the January 7, 2011 letter, the letter also mentioned

the Accrued Interest Waiver, stating:

> Please note that due to the occurrence of the Substantial
> Completion Default and the TCO Default, State Street is not
> required to waive the payment of Accrued Interest under
> Section 1.2 of the Loan Agreement.

As already described, the Third Modification of May 19, 2010 had

reiterated the provision about the Accrued Interest Waiver, originally

contained in the Second Modification.  As also described, the "occurrence

of the Substantial Completion Default and the TCO Default" occurred on

July 15, 2010 without the slightest word being said at that time about

any adverse effects regarding the Accrued Interest Waiver.  Nothing was

mentioned in that regard during all the activity of the next six months.  It

was only after some successful apartment sales occurred and State

Street's balance had been paid down very substantially that State Street decided to say something about the Accrued Interest Waiver, and even at that time, State Street took no definite position.  The bank merely said that "State Street is not required" to carry out the waiver.  State Street was surely continuing to hold out the waiver as an incentive for Gaia House to complete the payment of the $30 million indebtedness.

On January 13, 2011, Gaia House sold unit 5S for just under $5 million, reducing to $4.1 million the principal owed to State Street.

Around this time, Gaia House began looking for other lenders to "take out" State Street.  This was discussed between Lolli-Ghetti and Emslie in a series of telephone conversations beginning in February 2011.  There was a discussion of the possibility of selling the remaining three apartments, allowing State Street to be paid and the "waterfall" referred to earlier to take effect.  This meant that, after paying off State Street, the Gaia House equity of over $13 million would be paid, and anything above all that would be shared 50/50 between Gaia House and State Street.  According to notes of these conversations, there were two hypothetical sets of figures discussed, one yielding nothing from the 50/50 sharing, and the other yielding about $185,000 for each party in the sharing.  In addition, there was a discussion of the possibility of the Gaia House people using the Affiliate Purchase Rights to buy the remaining apartments in order to raise money to pay State Street. Lolli-Ghetti spoke of raising this money by obtaining a loan for $6 million

or $7 million.  Emslie asked Lolli-Ghetti to put whatever his proposal was in writing.

In these conversations, the figure used for the amount remaining to be paid State Street was a little over $4 million.  There was no discussion of adding in the Accrued Interest.

As Emslie requested, Lolli-Ghetti put the proposal in writing on March 15, 2011.  In the March 15 letter, Gaia House informed State Street that it would exercise its Affiliate Purchase Right to purchase the remaining three units, 8N, 11S, and PH1, for their Minimum Unit Sales Prices: $4,520,000, $4,640,000, and $7,600,000, respectively.  The total of these amounts was $16,760,000.  The letter went on to say that the aggregate purchase price would repay in full the remaining $4,107,269 balance on the State Street loan, and the remainder would be applied pursuant to the "distribution waterfall" in the Lockbox Agreement.  Thus, this remainder of $12,652,731 would be applied towards partial repayment of Gaia House's equity.  The letter made it clear that no funds would be available to be disbursed in respect of items subordinate to the equity.  This was an obvious matter of arithmetic, since the equity was approximately $13.4 million.  This meant that there would be nothing for the 50/50 sharing.

State Street's response was its letter of March 24, 2011, described earlier in the Introduction to this opinion.  The letter stated that State Street "has no objection to Borrower's exercising its right . . . to purchase

the remaining Residential Units for their respective Minimum Unit Sales Prices in order for Borrower . . . to repay the loan in full on or before June 3, 2011." The letter went on to state that, as State Street had "previously advised you, two Events of Default have occurred and are continuing. As a result of these Events of Default," State Street "is not required to waive and will not waive the payment of Accrued Interest." The letter specified that the "Outstanding Loan Balance at Initial Maturity is $4,107,268.78." The Accrued Interest to be due as of June 30, 2011 would be $4,291.41.15, but as will be described below, the final amount charged was over $4.5 million.

   The two Events of Default were the failure to get the TCO for PH2 by July 15, 2010, and the alleged failure to achieve Substantial Completion by that date. Of course, the issue about the TCO had been resolved months before and was clearly not "continuing." As to Substantial Completion, the letter did not provide any factual basis for stating that this default was continuing as of March 24, 2011. The record is completely devoid of evidence that State Street had ever been complaining to Gaia House in the months gone by about failure to achieve Substantial Completion. Certain work needed to be done on the building in late 2010 and even in early 2011, and Gaia House was busy taking care of these issues. But a degree of completion had clearly been achieved which was sufficient to allow sales of enough apartments to pay down completely the senior debt to iStar of $45 million, and to pay the

$30 million debt to State Street down to $4.7 million.  And now, Gaia House, or affiliates, were purchasing the remaining three units so that they could raise money to make the final payment to State Street, and they did this in a way which they had a contractual right to do, as State Street acknowledged in its March 24 letter.

This correspondence was followed by lengthy letters of Gaia House, dated April 5, 2011, and State Street, dated April 13, 2011.  Gaia House, of course, objected to the position of State Street, and State Street wrote as to why its position was justified.

The April 13 State Street letter showed that it was really not relying on any idea of continuing and uncured Events of Default, but was relying on the fact that Events of Default had occurred on July 15, 2010, and that, under the relevant provisions of the Loan Agreement, this nullified the Accrued Interest Waiver.  It is also true that the State Street letter finally made mention of the detailed definition of Substantial Completion, contained in the Loan Agreement.  It stated that none of the certificates or other documents required as constituting Substantial Completion under that definition had been furnished by July 15, 2010.  As noted earlier in this opinion, it is significant that State Street waited nine months, from July 15, 2010 to April 13, 2011, to make any mention of the alleged lapses occurring on July 15, 2010.  But the letter makes no mention of the actual state of the work at various stages, including the

progress on the project which had enabled so many apartments to be sold and further enabled almost all of the State Street debt to be paid.

On April 20, 2011, State Street met with Lolli-Ghetti and Woo in Boston to discuss a resolution of the dispute.  Gaia House asked for State Street to waive the Accrued Interest; State Street simply told Gaia House that it would stand on its contract rights.  There is no indication that any thorough discussion of detailed issues occurred.  It would appear that State Street stood by the position taken in the March 24 and April 13 letters to the effect that it did not object to Gaia House exercising its Affiliate Purchase Rights, and that the Accrued Interest Waiver was being nullified because of the Events of Default.

As has been described in the Introduction to this opinion, the trial testimony on behalf of State Street, by Emslie, took a bizarre turn.  His testimony about the reason or reasons why State Street nullified the Accrued Interest Waiver was as different from the position of State Street in the March 24 and April 13 letters as could be imagined.  As has been stated, the State Street letters expressly stated that State Street had no objection to Gaia house's exercise of the Affiliate Purchase Right.  No objection was stated as to the exercise of that right or to anything about the manner of such exercise.  Not a word is said in the letters about State Street being deprived of any opportunity under the 50/50 sharing provision.

Yet at the trial, Emslie's testimony was all about the 50/50 provision.  Emslie testified that when he received the March 15 letter from Gaia House, he felt "deflated" and "stunned."  He said that he felt that Gaia House's proposal was a "twisting of the intent" of the Affiliate Purchase Right.  He felt that the Affiliate Purchase Right was never meant to "circumvent the profit sharing" arrangement, but rather was meant to protect Gaia House from missing a payment covenant.  He immediately spoke with his lawyers, Trimont, and JLL, who all shared this reaction.  Emslie testified that they felt "dumb" and "kind of stupid" for not drafting the agreements to prevent this.  Emslie also testified that he felt "abused" and "disappointed" by Gaia House's plan, and that Gaia House's plan to "deprive" State Street of the 50/50 sharing caused State Street to decide it should take the Accrued Interest.  Emslie stated, "I felt I had two decisions: I had zero or accrued interest of over four million."

As has been described, State Street's January 7, 2011 letter had stated that because of the two alleged Events of Default, State Street was not required to carry out the Accrued Interest Waiver, but that letter had not actually stated that the waiver would be nullified.

In his trial testimony, Emslie made the all-important assertion that, as of March 2011, he intended to effectuate the Accrued Interest Waiver.  In other words, what this means is that, despite the fact that there had been the two alleged Events of Default on July 15, 2010 (now so strenuously relied upon by State Street in this litigation), he intended

to put into effect the Accrued Interest Waiver, and not have State Street collect such Accrued Interest.  His testimony in the trial was that the decision to nullify the Accrued Interest Waiver and to collect the $4.5 million of Accrued Interest was not because of the July 15, 2010 Events of Default, but was because State Street believed that it was being deprived of something of some benefit, under the 50/50 sharing provision.  Thus, he testified in response to a question by the court:

> THE COURT:  Now, is it your testimony, as far as your intention and your purpose, that if Gaia had stayed with the idea of selling to third parties and having the waterfall procedure go forward, you would not have decided to charge the accrued interest, is that what you're saying?
>
> THE WITNESS:  Yes, sir.

There are serious questions of credibility arising from the fact that State Street has presented two completely different versions of why it nullified the Accrued Interest Waiver.  In this connection, some further analysis of the 50/50 version is in order.  Before State Street could make anything from the 50/50 sharing, the proceeds of apartment sales would need to be used to pay off the remaining debt to State Street ($4.1 million plus some costs) and after this the Gaia House equity of $13.4 million would need to be paid.  What State Street was actually objecting to (if they indeed had this objection) was that the three remaining apartments were sold to affiliates for these Minimum Unit Sales Prices (which, of course, left nothing for the 50/50 sharing) instead of leaving them on the open market so that full market prices could be realized, with something

left for the 50/50 sharing.  However, the most valuable of the remaining apartments was Penthouse 1, which has a configuration making it difficult to market, as Lolli-Ghetti described to Emslie in one of his 2011 telephone conversations.  Although at one point there was a possibility of selling PH1 at a very handsome price ($11 million), this sale did not go through and to this day, none of them have been sold.  Counsel for State Street at a November 2011 hearing, and in argument at the trial, has referred repeatedly to this "offer," but this is of no avail because no sale was actually made.  Perhaps there are other reasons why the other apartments were among the last in line to be sold because none of these two has been sold either.

After informing Gaia House of its intention to charge the Accrued Interest, State Street and its representatives visited Gaia House to conduct a market study of the value of the remaining units.  State Street calculated that if it went forward with the 50/50 profit sharing, there would be $2 million to share 50/50 between Gaia House and State Street – $1 million to State Street, $1 million to Gaia House.  Moreover, it was an entirely speculative matter as to whether even this $1 million would be achieved, and if so, when.

State Street obviously felt, and correctly so, that it needed, and still needs, some justification for nullifying the Accrued Interest Waiver and demanding Accrued Interest of $4.5 million.  However, it abandoned the Events of Default reasoning at the trial, and any rudimentary analysis of

the 50/50 sharing possibility must have indicated that the potential of this sharing was hardly equal to demanding an effective $4.5 million in Accrued Interest Waiver.  Of course, State Street has its legal positions taken at the trial, but what the court is addressing now is something of great significance, both factual and legal, and that is the circumstance that a <u>decision</u> was made, and there must have been a reason or that decision.  As already stated, the court finds serious credibility problems with the evidence presented by State Street.  The only thing that is certain is that State Street sought to earn an extra $4.5 million.  The legal significance of all this will be discussed later in the opinion.

Gaia House commenced a lawsuit in Supreme Court, New York County, the principal object of which was to obtain a declaration that it did not owe State Street the $4.5 million of Accrued Interest.  This action was removed to the Federal District Court, where it was tried and is now lodged.

Despite the pendency of this litigation, both Gaia House and State Street needed to take steps to wind up their loan relationship.  The final extension would expire July 15, 2011.  There was still $4.1 million required to pay off the $30 million loan.  Also, State Street was now demanding an additional $4.5 million, based on its repudiation of the Accrued Interest Waiver.  In addition, State Street was demanding approximately $370,000 to cover attorneys' fees, which included certain attorneys' fees resulting from this litigation.

During the Spring of 2011, Gaia house started negotiations with Doral Bank to obtain financing to make the final payment to State Street. Gaia House originally sought a loan for $7 million.  However, Gaia House was now faced with the additional demands from State Street.  It decided to pay the additional amounts demanded, and to do so under protest, in order to prevent State Street from putting liens on the property.

State Street sent a final "payoff" letter to Gaia House dated July 15, 2011.  It assessed the additional Accrued Interest as amounting to over $4.5 million.  The letter requested payment, and also the execution of a broad release.  Gaia House made the payments, but did not execute the release.

As of July 19, 2011, Doral made a loan of $11,350,000.  It was secured by the three apartments, PH1, 8N, and 11S, which were owned by affiliates of Gaia House, which had made the purchase under the Affiliate Purchase arrangement.  After whatever transfers were needed, Gaia House paid State Street $8,971,527.79.  The payment was actually not made on July 15, 2011, but was made on July 20, 2011, for reasons having no significance in this litigation.

<u>The Claims</u>

After the action was commenced and removed to federal court, there was certain motion practice, which need not be described here. The case was then brought to trial by the court sitting without a jury.

During the trial, the court granted Gaia House's motion to amend its complaint to conform to the proof offered at trial. This amendment added the three Gaia House affiliates as plaintiffs.

The principal issue at trial was whether Gaia House is entitled to the return of the $4.5 million in Accrued Interest. Other issues were whether Gaia House is entitled to the return of a portion of the $370,000 demanded by State Street to cover attorneys' fees and whether Gaia House is entitled to retain approximately $700,000 from the PFA. Finally, there is the issue about whether the affiliates are entitled to recover increased financing costs due to a wrongful demand by State Street of the $4.5 million Accrued Interest, which increased the amount of borrowing that needed to take place.

## DISCUSSION

Accrued Interest

Gaia House, in seeking the return of the Accrued Interest, relies on three claims well-established in New York law. The first relates to the implied covenant of good faith and fair dealing. The second is equitable estoppel. The third claim relies on general equitable principles, one of which is that equity intervenes to prevent a substantial forfeiture.

The implied covenant of good faith and fair dealing "is implied in all contracts" and "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Fishoff v. Coty, Inc.,

634 F.3d 647, 653 (2d Cir. 2011).  It does not "create new duties that negate [defendant's] explicit rights under a contract, but rather, seek[s] imposition of an entirely proper duty to eschew . . . bad-faith targeted malevolence in the guise of business dealings." Richbell Information Servs., Inc. v. Jupiter Partners, L.P., 765 N.Y.S.2d 575, 587 (1st Dep't 2003).

Although a contract may give a party broad discretion, the implied covenant requires the party "not to act arbitrarily or irrationally in exercising contractual discretion." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995).  The implied covenant of good faith and fair dealing serves as a meaningful limit on contractual discretion. See id.; see also Outback/Empire I, Ltd. Partnership v. Kamitis, Inc., 825 N.Y.S.2d 747, 748 (2d Dep't 2006) (reasoning that "although certain provisions allowed the plaintiff, in its sole and absolute discretion, to terminate its obligations under the lease, the plaintiff was required to carry out its contractual obligations incident to the exercise of its discretion in good faith.").  Such discretion may not be exercised "malevolently, for [one's] own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits" of the contract. Richbell Information Servs., Inc., 765 N.Y.S.2d at 587.

A claim for equitable estoppel under New York law requires the plaintiff to show an act constituting a concealment of facts or misrepresentation; an intention or expectation that such acts will be

relied upon; actual or constructive knowledge of the true facts by the wrongdoers; and reliance upon the misrepresentation which causes the innocent party to change its position to its substantial detriment. General Electric Capitol Corp. v. Armadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994).

Under New York law, "equity will often intervene to prevent a substantial forfeiture occasioned by a trivial or technical breach." Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc., 46 N.Y.2d 573, 576-77 (1979).

In this litigation State Street argues that the relevant provisions of the Loan Agreement are an absolute bar to the recovery of the Accrued Interest. State Street argues that there were certain Events of Default, which occurred on July 15, 2010, and as of that time, the waiver of Accrued Interest was conclusively destroyed, and that no subsequent events had any effect in curing or creating any grounds for relief from the nullification which occurred on July 15, 2010.

State Street's position is, among other things, that there is no relevance to the issue of a "decision" to charge the Accrued Interest in March 2011, and no relevance as to what that decision was or why it was made. According to State Street's litigation position now, the nullification of the Accrued Interest Waiver was absolute, as a matter of contract, on July 15, 2010.

This is completely contrary to the way State Street and Gaia House treated the issues in the course of carrying out the project. It will be remembered that the Accrued Interest Waiver was granted to Gaia House to give Gaia House the incentive to complete the construction and effectuate apartment sales in order to pay off the senior loan and the State Street loan. It follows logically, and it was surely so in fact, that Gaia House considered that, in return for the Accrued Interest Waiver, it would complete the project and pay off the loans (without, of course, the Accrued Interest which had been waived). For its part, State Street was intent on providing the above incentive and, keeping that incentive in place. It should be noted that if indeed State Street had intended that Events of Default of July 15, 2010 acted to cut off the Accrued Interest Waiver then and there, it should have, and the court believes would have, provided immediate notification to Gaia House that the Accrued Interest Waiver was ended. But State Street did just the opposite. It was completely silent on the subject. There is no doubt about the fact that such silence was deliberate so as to provide no disturbance to the idea that the Accrued Interest Waiver continued.

The court finds that State Street treated the Accrued Interest Waiver as something that had discretion and treated the Events of Default of July 15, 2010 as subject to this discretion. The evidence at trial, including Emslie's testimony, leaves no doubt about this. The court concludes that Gaia House performed entirely and completely what it

was supposed to perform, so that any fair and reasonable exercise of discretion would be in its favor as to the Accrued Interest. The New York law about the covenant of good faith and fair dealing required, under the facts of this case, that the waiver of Accrued Interest be honored. It is also the view of the court that the doctrine of equitable estoppel applies to prevent Gaia House from being the victim of any misleading inducement, which caused it to continue on and on in this difficult project under the impression, surely nourished by State Street, that it would ultimately enjoy the Accrued Interest Waiver. It is also the court's view that the New York law about general equitable principles applies to prevent a substantial forfeiture occasioned by a trivial or technical breach. By the time of State Street's demand for the Accrued Interest in the Spring of 2011, any Events of Default of July 15, 2010 were of the most technical nature, and nothing more.

As already stated, the court believes that the treatment of the Accrued Interest Waiver, in light of any Events of Default of July 15, 2010, involved a matter of discretion. This was indeed the way State Street treated the matter, and the record of evidence is overwhelmingly to that effect. This means that any decision taken in the exercise of that discretion was required to be a matter of good faith and fair dealing. The New York law on this is directly applicable. However, State Street has provided nothing approaching a satisfactory and credible explanation for its decision to nullify the Accrued Interest Waiver. As already explained,

State Street has taken two completely contradictory positions – one in the letters of March and April 2011, and another in the evidence presented at trial.  The position that was taken in the letters was entirely unsatisfactory.  The letters relied entirely on the idea that the contract terms nullified the Accrued Interest Waiver as of July 15, 2010.  Nothing in the letters dealt in any way with the conduct of the parties after July 15, 2010 and the continued use of the Accrued Interest Waiver as an inducement to Gaia House.

As to the explanation at the trial regarding the 50/50 sharing, this explanation does not hold up.  The court accepts the idea that State Street, at the time it granted the Accrued Interest Waiver in the Second Modification, had some hope of getting back some of the Accrued Interest, at least by means of the 50/50 sharing.  But, it is important to realize that, under no circumstances was the Accrued Interest Waiver conditioned upon or even connected with the 50/50 sharing, on a contractual basis or any realistic business basis.  The Accrued Interest Waiver related to a definite amount of money, which ultimately would involve $4.3 million (which increased to $4.5 million in the final demand).  The 50/50 sharing was entirely indefinite as to amount, or as to whether it would ever be realized at all, or as to when it would be realized if it was.

Further as to the trial testimony, the court credits Emslie in his testimony to the effect that State Street was ready in the Spring of 2011

to honor the Accrued Interest Waiver.  The problem is with Emslie's testimony about the reason for deciding not to do this.  The testimony that the Accrued Interest Waiver was withdrawn because State Street was deprived of the benefits of the 50/50 sharing is so implausible as to strain credibility.  If this actually happened, it is most difficult to consider the decision a rational one.

The court is left with the mere fact that State Street decided to earn an extra $4.5 million, with no satisfactory explanation for deciding to do this under the circumstances.  Thus State Street has presented nothing to show a fair and reasonable exercise of its discretion in this discretionary matter.  Such an explanation was necessary where the decision had the effect of depriving Gaia House of any ability to earn back the equity or make a profit.

To return to the State Street letters of March 24 and April 13, State Street stated that it had no objection to the Affiliate Purchases.  In the meeting of April 20, no such objection was voiced.  If the testimony at trial is true, this means that State Street indeed had a strong enough objection to cause it to nullify the Accrued Interest Waiver.  If the testimony at the trial is true, the statements in the letters about State Street having "no objection" were false.  If in fact there was an objection relating to the 50/50 sharing, it should have been stated at the time. Among other things, it could have led to negotiations of the kind that had taken place over and over in the relationship between State Street and

Gaia House.  In any event, such objection surely should not have been saved until the time of the trial.

Commencing in September 2009, when the Accrued Interest Waiver was inserted into the Loan Agreement, and continuing until the end of the project, the Accrued Interest Waiver continued to be in effect. This was not merely true in a technical sense, but from a practical standpoint, it was a most important part of the relationship between the parties.  This was the status both before and after July 15, 2010.  From the time the Accrued Interest Waiver was agreed upon until the end of the project, State Street deliberately intended to have the Accrued Interest Waiver present as an inducement for Gaia House to complete the project, sell apartments, and pay off both the senior indebtedness and the State Street debt.  Gaia House did all these things faithfully.  At the last stage, to make sure that the final payment to State Street would be on time, Gaia House exercised the Affiliate Purchase Rights for the remaining three apartments, in order to raise money to make the final payment to State Street on time.  This was exactly what the Affiliate Purchase Right was intended to be used for.  Gaia House has shown that it earned the Accrued Interest Waiver, and State Street has made no credible showing to the contrary.

The court has considered various defenses posed by State Street at the trial based on contractual provisions.  The court will not discuss these defenses in detail in this opinion.  The court believes that these

defenses, like the ones which the court has discussed, are overridden by the manner in which both Gaia House and State Street treated the project in fact and they are overridden by the doctrines and policies of New York law discussed in this section.

The court concludes that State Street has violated the implied covenant of good faith and fair dealing, is subject to equitable estoppel, and is subject to the general equitable principle described earlier.  Under these circumstances, State Street is liable for the amount of the Accrued Interest, paid under protest, and Gaia House is entitled to recover a refund.

Professional Fees

As described earlier in this opinion, the Second Loan Modification established a Project Fund Account ("PFA") that contained a portion of the proceeds from apartment sales.  Gaia House was able to withdraw sums from this account to pay the costs of construction.  Thirty days after Gaia House finished paying off the State Street loan, State Street was required to give Gaia House the money left in the PFA, which then totaled approximately $700,000.  However, State Street refused to turn over any portion of the PFA, arguing that it had a contractual right to use the amount left in the PFA to cover attorneys' fees resulting from this litigation.  During the trial, the parties stipulated that Gaia House could obtain the funds in the PFA, pending certain legal determinations in this case.

As already stated, at the time Gaia House paid off the State Street loan on July 20, 2011, one of the items it paid, under protest, was $370,000 to cover legal fees of State Street.  Now, Gaia House concedes that some of the $370,000 was properly due to State Street.  However, Gaia House seeks to recover that portion of the $370,000 which represents legal fees from this litigation.  Gaia House is also seeking a declaration that it is entitled to retain the $700,000 referred to above. State Street is counterclaiming, seeking a declaration that it is entitled to keep the $370,000, as well as further attorneys' fees incurred in this case, in an amount to be determined.

> The Loan Agreement requires Gaia House to
>
> immediately pay Lender on demand all costs and expenses, including Professional Fees, incurred by Lender in connection with or as a consequence of . . . an Event of Default . . . , the collection of the Debt . . . , [or] the enforcement of Lender's rights and remedies under the Loan Documents.

Professional Fees include attorney's fees, and such fees are included in the definition of "Debt" under the Loan Agreement.  Once the full amount of the loan is paid off, State Street is obligated under the Lockbox Agreement to return the PFA to Gaia House within thirty days.  However, various contractual provisions also give State Street the right to "apply at any time the balance then remaining in the Accounts [including the Project Fund Account] against the indebtedness secured hereby in whatever order Lender shall subjectively determine."

As these contractual provisions demonstrate, the question of whether Gaia House is entitled to the funds in the PFA is inextricably tied up with the question of whether State Street has a right to attorney's fees resulting from this litigation.  If Gaia House is required to pay State Street's attorney's fees resulting from this action, then State Street was acting within its rights when it refused to return the PFA, and can deduct its attorney's fees from the PFA.  If Gaia House is not required to pay State Street's attorney's fees in this action, then Gaia House is entitled to the full value of the PFA and the return of a portion of the attorney's fees that it has already paid State Street.

Under what is known as the "American Rule," each party generally bears its own attorney's fees in litigation, absent a contract or statute to the contrary.  Hardt v. Reliance Std. Life Ins. Co., 130 S. Ct. 2149, 2157 (2010).  However, it is common "for parties to a contract to include a promise by one party to hold the other harmless for a particular loss or damage and counsel fees are but another form of damage which may be indemnified in this way."  Hooper Assocs., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 491 (1989).  The New York Court of Appeals has held that because

> a promise by one party to a contract to indemnify the other
> for attorneys' fees incurred in litigation between them is
> contrary to the well-understood rule that parties are
> responsible for their own attorneys' fees, the court should
> not infer a party's intention to waive the benefit of the rule
> unless the intention to do so is unmistakably clear from the
> language of the promise.

<u>Id.</u> at 492.

State Street's contractual right to have Gaia House pay its Professional Fees is most akin to a right to have Gaia House indemnify it for its attorney's fees.  Thus such an agreement to pay State Street's attorneys' fees must be "unmistakably clear."  <u>Id.</u>  To reiterate, State Street has a right to attorney's fees "in connection with or as a consequence of . . . [a]n Event of Default . . . , the collection of the Debt . . . , [or] the enforcement of Lender's rights and remedies under the Loan Documents."

First, this litigation is not "in connection with or as a consequence of" any Event of Default.  Rather, Gaia House instituted this litigation to enforce its rights against State Street, while State Street was unjustifiably withholding Accrued Interest in violation of the legal and equitable doctrines discussed above.  Second, State Street did not institute this litigation to seek "collection of the Debt."  Rather, State Street has been paid in full and Gaia House started this lawsuit to recover a sum it was forced to overpay.  Although the court is cognizant of the fact that the term "Debt" includes attorney's fees, which State Street is trying to collect in this litigation via its counterclaims, surely State Street cannot be entitled to attorney's fees in any litigation filed against it where, as here, it makes an incidental counterclaim for attorney's fees.  Third, State Street did not institute this action to enforce any rights or remedies under the Loan Documents.

Finally, State Street argues that Gaia House is not entitled to a return of these attorney's fees because Gaia House waived its right to seek damages under the Loan Agreement.  "Under New York law, sophisticated parties with equal bargaining power can agree to limit the liability that the other may recover from a breach of contract."  DynCorp v. GTE Corp., 215 F. Supp. 2d 308, 317 (S.D.N.Y. 2002) (citation omitted).  In DynCorp., the court enforced a cap on damages.  Id. at 318.  In Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, 84 N.Y.2d 430, 438-39 (1994), the court enforced a limitation on liability for consequential damages, limiting such liability to damages caused by intentional misrepresentations, willful acts, and gross negligence.

Here, State Street argues that the following provision defeats Gaia House's claim for a refund of the attorney's fees it has paid to State Street in connection with this litigation:

> Section 12.14.  Reasonableness.  If at any time Borrower believes that Lender has not acted reasonably in granting or withholding any approval or consent under the Loan Documents or any other document or instrument now or hereafter executed in connection with respect to the Loan, as to which approval or consent either Lender has expressly agreed to act reasonably, or absent such agreement, a court of law having jurisdiction over the subject matter would require Lender to act reasonably, then as the sole and exclusive remedy of Borrower and each Loan Party, Borrower or such Loan Party shall be entitled to seek injunctive relief or specific performance.  Further, Borrower and each Joinder party hereby covenant and agree that no action or claim for monetary damages, consequential damages or punitive damages or any other damages (including lost profit) shall in any event or under any circumstance be maintained by Borrower or any other Loan Party against

Lender, and borrower and each Joinder Party hereby waive any right to any such damages.

Reading this provision as a whole, the first sentence of this provision limits the application of the second sentence.  The second sentence includes a waiver of the right to bring a claim for damages.  However, the waiver must be interpreted in conjunction with the first sentence, which indicates that the sole remedy for Lender unreasonably withholding any approval or consent is injunctive relief or specific performance.  Although the second sentence uses broad language that could be read to suggest that Gaia House waives its right to bring damages "in any event or under any circumstance," this term is part of a larger provision that deals with Gaia House's remedies for State Street unreasonably failing to give its consent or approval.  As such, the court interprets the damages waiver to apply in a case where State Street is alleged to have unreasonably withheld its approval or consent to some action.  Here, the damages waiver is inapplicable because Gaia House is not maintaining an action due to State Street's failure to "approve" or give "consent" to some action Gaia House sought to take.[4]

Additionally, even if the damages waiver did apply in this case, State Street mischaracterizes Gaia House's claim for a refund of the attorney's fees.  Gaia House is simply seeking a refund of attorney's fees

---

[4] State Street also relies on other similar provisions of the Pledge and Security Agreement entered into by Gaia House and State Street, which involve waivers of the right to seek damages.  They are irrelevant for the same reasons that section 12.14 of the Loan Agreement is irrelevant.

that it was unlawfully made to overpay.  This damages waiver provision cannot be read to mean that where State Street improperly requires Gaia House to overpay and then refuses to refund the amount of the overpayment, Gaia House has waived its right to sue for a refund.  State Street's position regarding the refund of the attorney's fees is also belied by its position regarding the Accrued Interest.  State Street does not argue that this damages waiver bars Gaia House's claim for Accrued Interest, which similarly seeks a refund of money that Gaia House overpaid.

Therefore, Gaia House is entitled to retain the approximately $700,000 from the PFA.  It is also entitled to judgment for the portion of the $370,000 which relates to fees for this litigation.  That amount is to be determined.  State Street is not entitled to a refund of the $700,000. It is not entitled to the portion of the $370,000 relating to this litigation, nor is it entitled to the additional legal fees for this litigation, which it has requested.[5]

---

[5] Gaia House also initially sought the return of the funds in the PFA pursuant to the New York Lien Law.  The court has now determined that as a matter of contract, Gaia House is entitled to a refund of the attorney's fees it paid State Street to the extent such attorney's fees resulted from this litigation, and that State Street has no valid contractual claim for attorney's fees related to this litigation.  Absent a claim for fees, State Street has no claim to the PFA.  Because, pursuant to the parties' stipulation, State Street is no longer holding the PFA, and the court has determined that State Street has no claim to it, this claim under the New York Lien Law is dismissed on mootness grounds.

Doral Financing Costs

The affiliates of Gaia House who ultimately purchased the three units pursuant to the Affiliate Purchase Right are (i) West Sky LLC; (ii) 200 11th 11S LLC; and (iii) 24th Street Capital Group I LLC.  The affiliates claim that they suffered increased costs in connection with these loans as a result of State Street's unjustified refusal to waive Accrued Interest.  This refusal required these entities to seek an increased loan amount from Doral Bank in connection with the takeout financing, and incur increased financing charges in connection with the increased loan amount.  As described above, because they took out a larger loan, the affiliates paid $328,097 in increased costs.

Initially Gaia House sought to recover these damages for itself. However, at trial it became clear that as a technical matter, Gaia House was not the party that suffered these damages.  The record at trial demonstrated that Gaia House's affiliates, not Gaia House itself, took out these loans and purchased these apartments, and thus if anybody suffered increased costs as a result of the loans, it was Gaia House's affiliates.

State Street argues that Gaia House's affiliates cannot recover their increased loan costs because they are not parties to the Loan Agreement and are not third party beneficiaries.  Under New York law, a contract confers third party beneficiary rights where it appears that no party other than the third party can recover if the promisor breaches the contract, or

where the contract clearly demonstrates the intent to allow a third party

to enforce the contract.  <u>Fourth Ocean Putnam Corp. v. Interstate</u>

<u>Wrecking Co., Inc.</u>, 66 N.Y.2d 38, 45 (1985).  A third party is "entitled

only to those rights which the original parties to the contract intended

the third party to have."  <u>Leavitt-Berner Tanning Corp. v. American Home</u>

<u>Assur. Co.</u>, 516 N.Y.S 2d 992, 995 (1987).  The intent to benefit a third

party "must be clear from the face of the contract."  <u>Coalition of 9/11</u>

<u>Families, Inc. v. Rampe</u>, No. 04 Civ. 6941 (JSR), 2005 U.S. Dist. LEXIS

1913, at *5-6 (S.D.N.Y. Feb. 8, 2005).

Here, the Loan Agreement expressly contemplates that third

parties will have rights under it.  The Affiliate Purchase Right is a right

that can be exercised either by Gaia House or "an Affiliate" of Gaia

House.  To reiterate, that provision provides:

> Notwithstanding any contrary provisions in this Agreement
> or the Loan Documents (including, without limitation, the
> terms of Section 7.27(a)(iv) of the Loan Agreement), Borrower
> or an Affiliate of Borrower shall be allowed to purchase any
> of Residential Units 5S, 7S, 8N, 9S, 11S, PH1, and PH2 in
> order to satisfy the Loan and Senior Loan reduction
> covenants described above at the applicable "Minimum Unit
> Sales Price," provided that neither Borrower nor such
> Affiliate shall be permitted to market, or resell any such
> Residential Unit or Units until the repayment in full of the
> Loan unless, in connection with the closing of any such
> resale the Loan would be paid off.

An "Affiliate" of Gaia House is a third party who is not a party to the Loan

Agreement, and who has been given a right under the Loan Agreement to

purchase units at the Minimum Unit Sales Price.  Thus Gaia House's

affiliates are third party beneficiaries of the Loan Agreement.  However, the Loan Agreement also provides:

> No Third Party Beneficiary:  No Person other than Lender and Borrower and their permitted successors and assigns or any Indemnified Lender Party shall have any rights under this Loan Agreement.

The court must reconcile these two contradictory provisions.  One of them clearly creates third party beneficiary rights in Gaia House's affiliates notwithstanding "any contrary provisions in this Agreement." The "No Third Party Beneficiary" provision, on the other hand, says that third parties have no rights under the Loan Agreement.  The "No Third Party Beneficiary" provision is a provision that is contrary to the plain terms of the Affiliate Purchase Right.  However, the Affiliate Purchase Right takes precedence over the "No Third Party Beneficiary" provision because the Affiliate Purchase Right was specifically added to the agreement in the Second and Third Modifications (after the "No Third Party Beneficiary" provision, which was in the original Loan Agreement), and it applies notwithstanding "any contrary provisions in this Agreement," such as the "No Third Party Beneficiary" provision. Therefore, Gaia House's affiliates are third party beneficiaries under the Loan Agreement, and the "No Third Party Beneficiary" provision does not affect their claims.

State Street also argues that the Loan Agreement provision referenced above, in which Gaia House waives its right to pursue damages from State Street based on State Street's unreasonable

withholding of a consent or approval, bars the affiliates' damages claim. However, as described above, that provision is inapplicable in the present circumstances. Additionally, the affiliates, who are not parties to the Loan Agreement, never agreed to waive their right to pursue damages.

State Street's wrongful charging of the Accrued Interest forced Gaia House's affiliates to incur $328,097 in increased costs. As described above, Gaia House is to be refunded the Accrued Interest. The affiliates of Gaia House that took out the loan to pay off State Street are entitled to recover the increased financing costs that they suffered.

## Conclusion

Gaia House is entitled to a judgment of $4,558,500, the full amount of the Accrued Interest it overpaid. Gaia House is also entitled to recover that portion of the $370,000 representing attorneys' fees for this litigation, the exact amount to be determined. Gaia House is entitled to a declaration that it may retain the $700,000, which was paid to it from the PFA subject to further legal determination. Gaia House's affiliates are entitled to an award of $328,097. Plaintiffs are entitled to costs and prejudgment interest.

SO ORDERED.

Dated: New York, New York
April 30, 2012

Thomas P. Griesa
U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/30/12